**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) | MDL No. 2:18-mn-2873-RMG |

| | |
|---|---|
| CITY OF CAMDEN, CITY OF BROCKTON, CITY OF SIOUX FALLS, CALIFORNIA WATER SERVICE COMPANY, CITY OF DELRAY BEACH, CORAOPOLIS WATER & SEWER AUTHORITY, TOWNSHIP OF VERONA, DUTCHESS COUNTY WATER AND WASTEWATER AUTHORITY AND DALTON FARMS WATER SYSTEM, CITY OF SOUTH SHORE, CITY OF FREEPORT, MARTINSBURG MUNICIPAL AUTHORITY, SEAMAN COTTAGES, VILLAGE OF BRIDGEPORT, CITY OF BENWOOD, NIAGARA COUNTY, CITY OF PINEVILLE, AND CITY OF IUKA, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>-*vs*-<br><br>3M COMPANY,<br><br>*Defendant.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 2:23-cv-03147-RMG<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs CITY OF CAMDEN, CITY OF BROCKTON, CITY OF SIOUX FALLS,

CALIFORNIA WATER SERVICE COMPANY, CITY OF DELRAY BEACH, CORAOPOLIS

WATER & SEWER AUTHORITY, TOWNSHIP OF VERONA, DUTCHESS COUNTY

WATER AND WASTEWATER AUTHORITY AND DALTON FARMS WATER SYSTEM,

SOUTH SHORE, CITY OF FREEPORT, MARTINSBURG MUNICIPAL AUTHORITY,

SEAMAN COTTAGES, VILLAGE OF BRIDGEPORT, CITY OF BENWOOD, NIAGARA

COUNTY, CITY OF PINEVILLE, AND CITY OF IUKA, (collectively "Proposed Class Representatives"), by and through their attorneys Baron & Budd P.C., Douglas & London P.C., Napoli Shkolnik and Fegan Scott LLC (collectively "Proposed Class Counsel"), for their Class Action Complaint against Defendant 3M Company ("Defendant" or "3M") allege on behalf of themselves and others similarly situated as follows:

## INTRODUCTION AND BACKGROUND

1.    The Proposed Class Representatives are public water entities and/or private companies that provide drinking water to the public ("Public Water Systems"), and they bring this class action lawsuit on behalf of themselves and other similarly situated Public Water Systems (the "Proposed Class Members") arising from the widespread contamination of water intended for distribution to consumers and users with per- and polyfluoroalkyl substances ("PFAS"), a family of chemical compounds that includes perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

2.    Collectively, the Proposed Class Representatives and Proposed Class Members supply drinking water to tens of millions of individuals nationwide. The Proposed Class Representatives own and/or operate drinking water wells and/or public water supply systems that allow them to supply water to residences, schools, and businesses. These drinking water wells and/or water supplies have been contaminated with PFAS. The Proposed Class Representatives seek to represent all similarly situated owners and/or operators of drinking water wells and water supplies that have likewise been contaminated with PFAS, or are currently required to test for it under UCMR 5 or applicable state or federal law.

3.    At various times from the 1940s through 2002, Defendant 3M developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or

used PFAS alone or in end products manufactured with or containing PFAS (collectively referred to as "Defendant's PFAS").   Defendant's PFAS were used in products, such as aqueous film-forming foam ("AFFF"), Teflon, Scotchgard products, such as soil, oil and water repellent products, coatings used for oil and grease resistance on paper packaging, and specialty components for other products.

4.     Defendant's PFAS are manufactured compounds that are toxic and bioaccumulative and do not biodegrade, thus, causing them to persist in the environment, move readily through soil and groundwater, and pose a significant risk to human health and safety.

5.     Defendant developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS with the knowledge that these toxic compounds would be released into the environment when used as directed, instructed and/or intended.

6.     As far back as 1979, if not earlier, Defendant 3M was aware that Defendant's PFAS would be and have been used, released, stored, and/or disposed of at, near or within the vicinity of the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members, and that they would enter the environment, migrate through the soil, sediment, stormwater, surface water, and groundwater, thereby contaminating or threatening to contaminate the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members.

7.     Nevertheless, Defendant elected to develop, manufacture, formulate, distribute, sell, transport, store, load, mix, apply and/or use Defendant's PFAS, thereby placing profits over human health and the environment.

8. At all relevant times, beginning decades ago and continuing until 2002, Defendant's PFAS were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied, used and/or disposed of in the vicinity of the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members.

9. During these activities, and at all relevant times, Defendant's PFAS were being applied, used and/or disposed of as directed, instructed and/or intended by the manufacturers, which allowed PFAS to enter the environment. When applied, used and/or disposed of as directed, instructed and/or intended by the manufacturers, these compounds migrated through the soil and into the groundwater, thereby contaminating the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members.

10. One product Defendant manufactured was AFFF, which is a firefighting agent used for training and to control and extinguish Class B fuel fires, that was distributed, and/or sold at military and civilian airports and to municipal fire departments throughout the United States.

11. Regarding AFFF specifically, Defendant developed, manufactured, formulated, distributed, and/or sold Defendant's PFAS-containing AFFF for use by its customers with the knowledge that toxic compounds would be released into the environment during fire protection, training, and response activities even when the AFFF was used as directed, instructed and/or intended by the manufacturers.

12. Further, regarding AFFF specifically, Defendant developed, manufactured, formulated, distributed, and/or sold Defendant's PFAS-containing AFFF with the knowledge that large quantities of PFAS would be stored, used, and/or maintained in a manner such that these toxic chemicals would be released into the environment and contaminate the air, soil, and groundwater.

4

13.    At all relevant times, beginning decades ago and, continuing to approximately 2015, Defendant's PFAS-containing AFFF was used and stored at fire training facilities, fire departments, airports, and military bases for fire protection, training, and response activities. During these activities, Defendant's PFAS-containing AFFF was used as directed, instructed and intended by Defendant 3M, which allowed PFAS to enter the environment and leach into the air, soil, and groundwater, thereby contaminating the drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members.

14.    As a result of their exposure to Defendant's PFAS that were applied, used and/or disposed of as directed, instructed and/or intended by Defendant 3M, the Class members either have detected numerous discrete PFAS chemicals in their respective drinking water wells and water supplies at substantial levels and/or are threatened with such detection.

15.    The Proposed Class Representatives bring this action, individually and on  behalf of all others similarly situated, against Defendant to recover any and all relief with respect to the installation, maintenance and operation of, and cost associated with, any kind of treatment, filtration, remediation, testing, or monitoring of the ongoing contamination of their surface water, groundwater, soil, and sediment caused and/or created by Defendant's PFAS, as well as any and all punitive damages available as a result of the actions and/or inactions of Defendant, and to ensure that Defendant, as the responsible party, bears such expense, rather than the Proposed Class Representatives and Proposed Class Members.

16.    The Proposed Class Representatives seek to recover by this action the substantial costs necessary to protect the public and restore the damaged drinking water supply of their own surface water supplies and groundwater wells as well as those of other similarly situated Public Water Systems. These costs include, but are not limited to, the costs of testing and monitoring

water supplies for PFAS contamination, the costs of designing, constructing, installing, operating

and maintaining the treatment facilities and equipment required to comply with state and federal

safe drinking water laws and to remove PFAS from the drinking water supplied to the public,

and/or for the costs of securing alternative sources of water as a result of PFAS contamination.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §

1332 (d) because there is minimal diversity of citizenship among the parties, there are more than

one hundred members of the proposed Class, and the amount in controversy exceeds the sum or

value of $5,000,000.00 exclusive of interest and costs.

18.    Venue is appropriate in this District pursuant to the Order of the Judicial Panel on

Multidistrict Litigation which transferred and centralized all related action in this court for

coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C § 1407.

19.    Case Management Order No. 4 authorizes direct filing of the claim to this judicial

district.

## PARTIES

**A.**    **Proposed Class Representatives for the Proposed Class**

20.    **Plaintiff City of Camden ("Camden")** is located in Southeast New Jersey, in

Camden County, with a population of approximately 72,000. Camden provides drinking water to

all residents of the City of Camden, comprising approximately 13,666 metered accounts.

21.    Camden's system consists of 19 wells that draw from the lower Potomac Raritan-

Magothy (PRM) Aquifer. The system has a total max pumping rate of 27,600 gallons per minute.

The 19 wells are spread across four (4) wellfields in the City of Camden.  As of May 2023, 17 of

the 19 wells were active and, of these 17 active wells, ten have been taken out of service due to

PFAS contamination, which is believed to have resulted from firefighting training activities by the City of Camden's fire department.

22.     Camden's system utilizes two treatment plants, which treats ground water for iron and manganese removal by oxidation, settling and filtration. Volatile Organic Chemicals are removed via packed tower aeration. All treated water is disinfected with chlorine to maintain water quality in the distribution system.  Fifteen (15) of the groundwater wells are treated at the Morris-Delair Water Treatment Plant and two wells are treated at the Parkside Water Treatment Plant. Aside from PFAS, no other regulated contaminants have been detected in the City of Camden's drinking water supply at levels above the relevant MCLs.

23.     PFAS were first detected in the City of Camden's water supply in January 2018. The highest level of PFOA detected has been 163.9 ppt and the highest level of PFOS detected has been 75.2 ppt.

24.     In January 2020, the City of Camden removed six wells with significantly elevated levels of PFAS from service. Continued PFAS testing in 2020 revealed additional contamination and four (4) other wells were taken off-line.

25.     With these wells off-line, it was necessary to supplement the City's water supply for the next several years until adequate treatment could be installed to treat the water from Morris and Delair wellfields for PFAS. The City of Camden therefore entered into a 10-year Commodity Demand Water Supply Agreement ("CDWSA") with New Jersey-American Water to meet these needs. The City of Camden purchased 3.0 million gallons per day ("MGD") in 2021 and 2.5 MGD in 2022.  The City of Camden is paying approximately $300,000 per month for the purchased water.

26.     The City of Camden has installed a granulated activated carbon ("GAC") filtration system to remove PFAS at the Parkside Treatment Plant and is in the planning phase for the implementation of PFAS treatment at the Morris-Delair Plant.

27.     **Plaintiff City of Brockton ("City of Brockton")** is located in Plymouth County, Massachusetts, and is the owner and operator of the Brockton Water Department ("BWD").  The BWD is a public water system currently serving approximately 23,000 active water service accounts, over 3,000 hydrants and over 5,500 valves in the City of Brockton, Towns of Avon, Hanson, Halifax, Pembroke, and Whitman.

28.     The BWD obtains water from Silver Lake and the Brockton Reservoir.  Silver Lake is the primary supply (88.25% of total) and is located approximately 15 miles southeast of the center of Brockton. Over 50% of the watersheds are either owned by the City of Brockton or in conservation protection.  Water from the lake is treated at the Silver Lake Water Treatment Plant ("SLWTP") and is transmitted through two 24-inch diameter mains to Brown's Crossing Pumping Station.  After Brown's Crossing, the water is pumped through one 36-inch diameter and two 24-inch diameter transmission mains to the Brockton service system.  The Brockton Reservoir is a supplemental supply (5.51% of total) to Silver Lake and is blended into the system at Woodland Avenue.[1]

29.     Beginning in 2020, the City of Brockton started testing the water for PFAS under the Massachusetts Department of Environmental Protection's guidance.  Testing at that time showed PFAS6[2] levels totaling 28 ppt from a water sample taken at the Brockton Reservoir.

---

[1] The BWD purchased the remaining 6.24% of its water from Aquaria.

[2] The six PFAS are: PFOS, PFOA, PFHxS, PFNA, PFHpA, and PFDA.  MassDEP abbreviates this set of six PFAS as the "PFAS6" and has used them to set a drinking water standard meant to be protective against adverse health effects for all people consuming the water.  *See*

Subsequent testing performed at the Brockton Reservoir reported high levels of PFAS6 at 28ppt. The City of Brockton also performed water testing on November 18, 2021, showing PFAS6 levels of 35.63 ppt in finished water and 40.33 ppt in raw water at the Brockton Reservoir and the Woodland Avenue Water Treatment Plant.

30.    The City of Brockton took the Brockton Reservoir out of service and is currently purchasing water from the Aquaria Desalination Plant to comply with their water supply demands. While removed from service, upgrades were completed at the Woodland Avenue Water Treatment Plant.  Upgrades included replacing both filter carbons with new granular activated carbon which are designed to reduce PFAS6 from the water.  The City of Brockton is following the guidance and testing requirements of the Massachusetts Department of Environmental Protection as it pertains to PFAS.

31.    **Plaintiff City of Sioux Falls ("Sioux Falls")** is a municipal corporation and public water provider, existing under the laws of the State of South Dakota, with its primary address at 231 N. Dakota Avenue, Sioux Falls, South Dakota, 57104.  Sioux Falls supplies drinking water to customers in Minnehaha and Lincoln Counties and in the City of Sioux Falls. The drinking water is obtained in part from groundwater wells that draw from the Big Sioux Aquifer. Sioux Falls has a property interest in the water it appropriates, treats, stores, and distributes to the public as well as in its wells, piping, distribution system, and water treatment facilities.

---

https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#:~:text=Drinking%20Water%20Standards%20and%20Health%20Information,-Massachusetts%20PFAS%20Standard&text=The%20six%20PFAS%20are%3A%20PFOS,all%20people%20consuming%20the%20water  (Last accessed on June 7, 2023).

32.     At least 20 of Sioux Fall's wells are contaminated with PFOS and PFOA, which is believed to have resulted from firefighting training, protection and response activities by the Sioux Fall's fire department.

33.     **Plaintiff California Water Service Company ("Cal Water")** is a California public utility water corporation incorporated under the laws of the State of California with its principal place of business in San Jose, California.

34.     Cal Water owns and operates public drinking water systems that provide potable drinking water to residents and businesses in various locations throughout California, including but not limited to Bakersfield, Bakersfield-North Garden, Marysville, Salinas, Selma, South San Francisco, Stockton, Tulco and Visalia. Each of these systems is subject to the rules and regulations of the California Public Utilities Commission, and with respect to each such system, Cal Water has a certificate of convenience and necessity pursuant to which Cal Water has a duty to provide water service.

35.     Each of these water systems includes, among other elements, drinking water production wells that draw from groundwater aquifers and associated pumping, storage, treatment and distribution facilities and equipment.     Among other things, Cal Water has the right to appropriate and use groundwater for drinking water supplies from such wells.

36.     Cal Water's water supply is contaminated with PFAS.

37.     **Plaintiff City of Delray Beach ("City of Delray Beach")** is located in Florida and is the owner and operator of a public water system serving approximately 68,000 residents with 22,000 service connections. The City of Delray Beach withdraws water from a shallow underground source called the east coast surficial aquifer, a 75 to 195 feet deep underground aquifer. There are 30 raw water wells located throughout the City of Delray Beach from which

water is drawn and piped to the water treatment plant. The surficial aquifer system in Florida includes any otherwise undefined aquifers that are present at land surface. It is made up of mostly unconsolidated sand, shelly sand, and shell. The aquifer thickness is typically less than 50 feet but can range up to 400 feet in Indian River and St. Lucie Counties. The City of Delray Beach is currently operating under a water use permit issued by the South Florida Water Management District. The water use permit allows for the withdrawal of up to 19.1 million gallons per day.

38.    In August 2020, the City of Delray Beach voluntarily started testing for PFAS in its water system. This testing showed PFAS in all their wells. PFAS levels ranged between 25.3 ppt to 92 ppt. Since 2020, the City of Delray Beach has been committed to test regularly for PFAS and continues to provide transparency of the process to its customers. Their most recent PFAS testing from June 13, 2022 continue to show PFAS contamination.

39.    The City of Delray Beach has paid an excess of $25,000 for PFAS testing. They are currently working on a project to construct a new water treatment plant. The new water treatment plant is meant to replace or complement the existing aged conventional lime softening plant and it will have a Nanofiltration system to remove PFAS. Also, it will be designed and constructed to meet all the latest regulatory requirements of the Environmental Protection Agency; the Florida Department of Environmental Protection and the Florida Department of Health. The new water treatment plant is projected to be online in late 2026 and has an approximate cost of $100 million.

40.    **Plaintiff Coraopolis Water & Sewer Authority** ("Coraopolis") is a municipal corporation organized pursuant to laws of the Commonwealth of Pennsylvania.

41.    Coraopolis operates a public water system that draws drinking water from eight groundwater wells located near the Ohio River, and serves 2,574 metered residential, commercial,

industrial and municipal accounts in the Borough of Coraopolis and small portion of Moon Township in western Pennsylvania.

42.     Coraopolis has detected PFAS compounds in sampling from all four of its groundwater wells.

43.     **Plaintiff Township of Verona ("Verona")** is located in Northern New Jersey in Essex County and provides drinking water to a population of approximately 15,000 with approximately 4,179 residential and commercial customer connections.

44.     Verona provides drinking water from two wells, both of which have been taken out of service because of PFAS contamination.  Prior to the PFAS contamination, Verona provided most of its water from its own wells and supplemented its supply with water purchased from the Passaic Valley Water Commission. Since the wells were shut down, however, one hundred percent of Verona's drinking water is purchased from the Passaic Valley Water Commission.

45.     PFAS were first detected in Verona's wells in December 2020. The highest level of PFOA detected was 23.3 ppt and the highest level of PFOS detected was 9.11 ppt.

46.     **Plaintiff Dutchess County Water and Wastewater Authority ("DCWWA")** currently owns and operates 13 water systems, 6 sewer systems, and one water transmission system located within 10 different municipalities, collectively serving over 5,500 residential and commercial customers. One of these 13 water systems is the **Dalton Farms Water System ("DFWS")**.

47.     The DFWS serves 2,055 residents through 603 service connections. The DFWS operates its own water system that contains four drilled wells on the northerly side of Recreation Road. The DCWWA tested the DFWS wells and results indicated that well #5A has detectable

12

amounts of PFOS that range from ND-8.51 ppt and PFOA that range from 1.8 ppt to 30.5 ppt. These wells are located 1.5 miles from the Beekman Fire House ("BFH").

48.    **Plaintiff City of South Shore ("South Shore")** is located in Northeastern Kentucky in Greenup County and provides drinking water to a population of approximately 6,800 with approximately 2,069 residential and commercial customer connections.

49.    South Shore's drinking water system is comprised of eleven wells.  South Shore also purchases water from nearby public water suppliers to augment its groundwater well supply. The system has a total annal flow of 96,008,000 and the average gallons used per month is 8,000,000.

50.    PFAS were first detected in South Shore's wells in February 2020.  The highest level of PFOA detected was 72.10 ppt and the highest level of PFOS detected was 248 ppt.  All of the South Shore's wells were shut down due to PFAS contamination and South Shore now purchases one hundred percent of its drinking water from Portsmouth, Ohio via a temporary water line that is laid across a bridge.  South Shore is currently in the design process to make this line permanent by burying it under the Ohio River.

51.    **Plaintiff City of Freeport ("Freeport")** is the owner and operator of a water system serving approximately 25,000 residents located in and around the City of Freeport, Illinois. Currently, Freeport's system draws the drinking water it provides to customers from four groundwater wells. Two other wells that used to produce 75% of the city's water have been abandoned due to PFAS contamination.

52.    **Plaintiff Martinsburg Municipal Authority ("Martinsburg")** is a municipal corporation organized pursuant to the Pennsylvania Municipality Authorities Act, 53 Pa C.S.A. §5601 et seq.  Martinsburg operates four groundwater wells to supply drinking water to the

community.  Martinsburg has detected PFAS compounds in samples from all four groundwater wells.

53.    **Plaintiff Seaman Cottages ("Seaman Cottages")** is the owner and operator of a water system (a "Transient Non-Community System") serving ten cottages in their property. The main source of the water system is the Cape Cod Aquifer, located at Eastham Massachusetts. The wells are located four feet apart, with well 2 at 25' depth and well 3 at 35' depth and approximately 200' from the mean high tide mark. In September 2020, Seaman Cottages tested for PFAS for one well at a cottage sink and results showed a level of 18.18 ppt PFAS6. As a result, they tested both wells in October 2020 and results showed levels of 14.04 ppt PFAS6 and 14. 28 ppt PFAS6.

54.    **Plaintiff Village of Bridgeport ("Bridgeport")** is located in the state of Ohio and has a population of approximately 1,500 residents.  Bridgeport serves 1,150 metered accounts and produces Drinking Water through groundwater wells. Bridgeport historically utilized five groundwater wells. However, in recent years, findings of a variety of PFAS chemicals in four of its five wells have resulted in the closure of all five wells forcing Bridgeport to purchase all of its drinking water from City of Martin's Ferry.

55.    The Village first became aware of PFAS contamination through testing performed by the State of Ohio in 2020. PFAS findings were revealed in four of those wells (Wells 1-4) with Well 5 yielding no findings. However, Well 5 is too small to rely upon for consistent production of Drinking Water.

56.    **Plaintiff City of Benwood ("Benwood")** is located in Marshall County, West Virginia and has a population of approximately 1,245 residents. Benwood's water system provides water services to a population of approximately 1,510.  Benwood's water supply comes from two

groundwater wells. The source wells are located in the Alluvial Valleys Area of West Virginia. Total raw water production is approximately 175,000 GPD.

57.    Benwood first became aware of PFAS contamination through testing conducted by the United States Geological Survey (USGS) between 2019 and 2021. Further testing was conducted by the State of West Virginia in 2022. Over the course of testing, PFAS, including PFOS, PFOA, PFHxS, and PFBS, were detected in Benwood's water system.  PFOS results ranged from 8.56 to 14 ppt and PFOA was 5.3 ppt.

58.    **Plaintiff Niagara County Water District ("NCWD")** is a public water system located in New York and serves a population of 150,000 people through 108 service connections to Towns and Villages located in Niagara, Erie, and Orleans Counties. NCWD's drinking water is supplied from surface water drawn from the west branch of the Niagara River.

59.    The daily average volume of water treated and pumped into the distributions system in 2021 was 15,433,614 gallons per day and the total amount of water delivered to customers in 2021 was 5,617,835,384 gallons.

60.    The NCWD has not yet had their water system tested for PFAS, but is legally required to monitor for PFAS. The NCWD is subject to the monitoring rules of UCMR 5.

61.    Plaintiff City of **Pineville ("Pineville**") is located in the state of Louisiana and has a population of approximately 14,394 residents (according to the 2020 census).  Pineville serves 7,400 metered accounts.  Pineville produces drinking water through nine groundwater wells.  The city currently treats its water with chlorine prior to serving the same. It also operates a wastewater facility.

62.    Pineville underwent PFAS testing through UCMR3 and results for all nine chemicals tested therein were below the detection limit. However, Pineville is legally required to monitor for PFAS.  Pineville is currently awaiting the scheduling of UCMR5 testing.

63.    **Plaintiff City of Iuka, Mississippi ("Iuka")** is a public water system located in Mississippi and serves a population of 7,223 people through 2,736 service connections in Iuka, Mississippi. Iuka's drinking water is supplied from four groundwater wells.

64.    Iuka has not yet had their water system tested for PFAS and is subject to the monitoring rules of UCMR 5.

**B.    <u>Party Defendant</u>**

65.    **Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M")** is a corporation organized and existing under the laws of the State of Delaware and authorized to conduct business in California, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144.

66.    At all relevant times, Defendant 3M manufactured, marketed, promoted, distributed, and/or sold PFAS-containing products, such as AFFF, throughout the country.

67.    3M is the only company that manufactured and/or sold AFFF containing PFOS. 3M also manufactured and/or sold AFFF containing PFOA.

68.    At various times from the 1940s through 2002, Defendant 3M developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS.  Defendant's PFAS were later stored, handled, used, discharged, and/or disposed of at sites in the vicinity of the drinking waters wells and water supplies of the Proposed Class Representatives and Proposed Class Members.

69. Defendant's PFAS-containing products continued to be used until approximately 2015, and Defendant 3M was aware of such, even after it stopped developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendant's PFAS.

70. The Proposed Class Representatives, individually and on behalf of similarly situated Public Water Systems seek damages against Defendant 3M as set forth herein relating to their exposure to Defendant's PFAS.

## GENERAL FACTUAL ALLEGATIONS

### A. THE CONTAMINANT: PFAS

71. Defendant's PFAS is a family of chemical compounds that include PFOA and PFOS and many other compounds.

72. PFOA and PFOS are within a class of chemicals known as perfluoroalkyl acids ("PFAAs"). PFAAs are part of a larger chemical family known as PFAS.

73. PFAAs are composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature which is why these molecules are so persistent and bioaccumulate.

74. PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain. PFOS and PFOA are considered long-chain PFAAs because they have eight carbon atoms in their chain.

75. PFOS and PFOA do not occur in nature. Rather, they are stable, man-made chemicals. They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do

not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

76.     PFOS and PFOA are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[3]

77.     PFOS and PFOA are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[4]

78.     PFOS and PFOA are relatively stable once ingested, so they bioaccumulate in individual organisms for significant periods of time.  Because of this stability, any newly ingested PFOS and/or PFOA will be added to any PFOS and/or PFOA already present. In humans, PFOS and/or PFOA remain in the body for years.

79.     Additionally, PFOS and PFOA biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOS and/or PFOA.

80.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOS and PFOA, including but not limited to:

---

[3] *See* Agency for Toxic Substances and Disease Registry, Per- and Polyfluoroalkyl Substances and Your Health, available at https://www.atsdr.cdc.gov/pfas/index.html (Last Accessed June 7, 2023)

[4] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R16-005 (May 2016) at 55; Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 55, both available at https://www.epa.gov; Proposed PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies ("EPA determined that PFOA and PFOS are likely carcinogens (i.e., cancer causing) and that there is no level of these contaminants that is without a risk of adverse health effects."), available at https://www.epa.gov/system/files/documents/2023-03/FAQs_PFAS_States_NPDWR_Final_3.14.23_0.pdf. (Last Accessed June 7, 2023)

    a.   Altered growth, learning and behavior of infants and older children;

    b.   Lowering a woman's chance of getting pregnant;

    c.   Interference with the body's natural hormones;

    d.   Increased cholesterol levels;

    e.   Modulation of the immune system;

    f.   Increased risk of certain cancers; and

    g.   Increased risk of ulcerative colitis.

81.    The EPA has warned that there is evidence that PFAS are likely carcinogens.[5]

82.    The EPA has noted that "drinking water can be an additional source [of PFOS and PFOA in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example […] an airfield at which [PFOS or PFOA] were used for firefighting."[6]

83.    No federal or state agency has approved PFAS as additives to drinking water. No federal or state agency has approved releasing or discharging PFAS into groundwater.

---

[5] *See* Proposed PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies (March 14, 2023) ("EPA determined that PFOA and PFOS are likely carcinogens (i.e., cancer causing) and that there is no level of these contaminants that is without a risk of adverse health effects."), available at https://www.epa.gov/system/files/documents/2023-03/FAQs_PFAS_States_NPDWR_Final_3.14.23_0.pdf. (Last Accessed June 7, 2023)

[6] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (Last Accessed June 7, 2023)

84.     The EPA has announced its intent to regulate PFAS chemicals by issuing a primary drinking water standard (also known as a maximum contaminant level or "MCL").[7]

85.     Certain states have established concentration levels for drinking water.  For example, the California Department of Drinking Water ("DDW") has established "Notification Levels" at concentrations of 13 parts per trillion ("ppt") for PFOS and 14 ppt for PFOA. A Notification Level is a health-based advisory level established for chemicals in drinking water that do not have established maximum contaminant levels. When a Notification Level is exceeded, the water supplier must provide notice to its customers about the presence of the chemical and the health effects associated with it. DDW has also established a single "Response Level" of 70 ppt combined for both PFOA and PFOS. When possible, DDW recommends removing the source from service or providing treatment when the concentration exceeds the Response Level.

86.     At all relevant times, Defendant developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS and/or in end products manufactured with or containing PFAS.

87.     At all relevant times, Defendant's PFAS were used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of throughout the United States. Defendant's PFAS were used, for example, in waterproofing waxes, stain-preventing coatings, and AFFF used for firefighting.

88.     When applied, used and/or disposed of as directed, instructed and/or intended by Defendant 3M, Defendant's PFAS entered into the environment.

_____

[7] See PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18,638 (Mar. 29, 2023).

89.     Once Defendant's PFAS were free in the environment, they did not hydrolyze, photolyze, or biodegrade under typical environmental conditions.  Instead, they were and still are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

90.     The application, use and/or disposal of Defendant's PFAS as directed, instructed and/or intended by the manufacturers allowed PFAS to enter into and onto the respective properties of the Proposed Class Representatives and Proposed Class Members where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damage to the respective properties of the Proposed Class Representatives and Proposed Class Members.

91.     Due to the persistent nature of Defendant's PFAS, among other things, they have caused, and continue to cause, injury and damage to the respective properties of the Proposed Class Representatives and Proposed Class Members.

92.     One product Defendant manufactured, developed and sold is AFFF.  AFFF is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at military bases, aircraft carrier locations, and airports, among other places. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

93.     The vast majority of AFFF was used in training, which was an activity promoted by Defendant 3M.  When used as directed, instructed and/or intended, AFFF containing Defendant's PFAS released PFOS and PFOA into the environment.

94.     AFFF containing Defendant's PFAS has been used for its intended purpose in the process of fire protection, training, and response activities for many years. During these activities,

AFFF containing Defendant's PFAS were used as directed, instructed and/or intended by the manufacturers, which allowed PFOS and PFOA to enter into and onto the respective properties of the Proposed Class Representatives and Proposed Class Members where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damages.

95.    AFFF can be made without PFOA and/or PFOS.  Despite knowledge of this fact as well as knowledge of the toxic nature of AFFF made with Defendant's PFAS, Defendant continued to develop, manufacture, formulate, distribute, sell and/or transport Defendant's PFAS to be used in AFFF which led to the ongoing contamination and damages to the respective properties of the Proposed Class Representatives and Proposed Class Members.

96.    Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to, cause injury and damage to respective properties of the Proposed Class Representatives and Proposed Class Members.

97.    At all relevant times, Defendant was sophisticated and knowledgeable in the art and science of developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using products containing Defendant's PFAS.  Defendant understood far more about the properties of Defendant's PFAS—including the potential hazards they posed to human health and the environment—than any of their customers as well as the Proposed Class Representatives and Proposed Class Members.  Nevertheless, Defendant declined to use their sophistication and knowledge to design safer products and/or warn their customers, the Proposed Class Representatives and Proposed Class Members, of the dangers associated with Defendant's PFAS.

98.     As a direct and proximate result of Defendant's acts and omissions, as alleged in this Class Action Complaint, the respective drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members have been contaminated and will continue to be contaminated with PFOS and PFOA, thereby creating an environmental and public health hazard.  Such contamination caused by Defendant needs to be remediated.

99.     As a direct and proximate result of Defendant's acts and omissions, the Proposed Class Representatives and Proposed Class Members must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFOS and PFOA contamination on their respective drinking water wells and water supplies at significant expense, loss and damage.

100.     Defendant had and breached its duty to evaluate and test Defendant's PFAS adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before it sold such products. Defendant had and breached its duty to minimize the environmental harm caused by Defendant's PFAS. Moreover, Defendant failed to warn the Proposed Class Representatives and Proposed Class Members of the known risks for environmental and health hazards arising from the application, use and/or disposal of Defendant's PFAS when such products were being applied, used and/or disposed of as instructed, directed and/or intended.

## B.     DEFENDANT 3M'S USE OF PFAS AND ITS KNOWLEDGE OF THE DANGERS OF PFAS

101.     3M began manufacturing PFAS in the 1940s and acquired the patent rights to the electrochemical fluorination ("ECF") process in 1950.

102.     Using this technology, 3M developed a new class of chemicals known as fluorocarbons, including fluorinated surfactants or fluorosurfactants.

103.    3M subsequently received patents for specific fluorocarbon compounds, including PFOA and PFOS, throughout the 1950s and 1960s.

104.    Despite the "amazingly unique surface properties" of these compounds, 3M struggled to find commercial applications for its fluorosurfactants. An article published in the March 1952 issue of POPULAR MECHANICS magazine, aptly titled – "WANTED – Jobs for a Trillion New Chemicals" – explained that although "it's theoretically possible to produce around a trillion fluorocarbon compounds," and that 3M had identified "possible uses" for fluorocarbons, the company had not yet found commercial uses for them.

105.    Lacking commercial applications for its fluorochemicals, 3M published a "series of trade advertisements that featured the surfactant technology and made specific reference to the unique properties obtainable with the fluorochemical molecule."

106.    In 3M's own document, entitled, "*The History of the Development of "Light Water" Brand Aqueous Film Forming Foam Concentrates*," this advertising campaign was described as follows:

> The ads appeared in chemical industry trade journals and were designed to attract the bench chemist. When a request for more information was received from one of these ads, the respondent was sent a questionnaire in which he was asked to define his problem. The returned questionnaire was then screened by a committee from the laboratory and Commercial Development Department, and certain surfactant samples were sent. These samples were intended to be tried in the customer's laboratory as the solution to his problem. The samples were given 'L' numbers so that their chemical structure would not be identified.

107.    3M's advertising campaign worked, and its PFAS has since been used in various products, including AFFF, Teflon, Scotchgard products, such as soil, oil and water repellent products, coatings used for oil and grease resistance on paper packaging, and specialty components for other products.

108.    Regarding AFFF specifically, in March 1962, E.J. Jablonski and Dr. Richard L. Tuve at the Naval Research Laboratories ("NRL") responded to one of 3M's advertisements, inquiring about materials that might aid in the development of a new type of fire-fighting foam – AFFF.

109.    Over the next few months, 3M sent several samples of its surfactant L-1083 (later redesignated FX172), labeled as such so as to keep the chemical composition secret to NRL, and visited NRL at least twice to discuss their fluorosurfactant properties and to review testing results.

110.    3M also began working with another company, Ansul Company, to develop an effective AFFF dispensing system for the Navy.

111.    In 1963, 3M created its first successful AFFF formulation FX183, or "Light Water," and established pricing for sale to the Navy and Ansul.

112.    The following year, 3M and Ansul entered an agreement for testing and finalizing 3M's AFFF formulations for sale to the military and commercial markets.

113.    The companies continued to reformulate Light Water for the military throughout the 1960s, including the development of a seawater compatible foam after a tragic deck fire occurred on the USS Forrestal Aircraft carrier.

114.    In May 2000, 3M announced that it was exiting from the perfluorooctanyl chemistry market, but prior thereto, 3M occupied by far the largest market share of AFFF sales to the United States government.

115.    In the 50 years that 3M manufactured and sold PFAS-containing products, including its AFFF, it investigated them extensively, generating hundreds of studies and reports relating to their toxicology, pharmacology, epidemiology, teratology, carcinogenicity, fate, transport and human exposure.

116.    These studies repeatedly identified and confirmed the human and environmental risks associated with its PFAS containing products—information that 3M chose not to adequately and timely disclose to appropriate government authorities, including the EPA, despite having a regulatory obligation to do so under the Toxic Substances Control Act ("TSCA"). In the few instances when 3M did provide information to EPA, it did so in an incomplete and misleading manner.

117.    3M's lack of transparency regarding human exposure to PFOS is the cause for the government's ignorance. 3M waited over 20 years, until 1998, to notify the EPA that PFOS had contaminated the globe and could be found in the blood of virtually every man, woman, and child. In an attempt to conceal their delayed disclosure, 3M claimed this discovery to be "a complete surprise" that was only revealed by recent advancements in analytical techniques.  But this explanation was untrue.

118.    In reality, 3M learned in the summer of 1975 that two independent toxicologists, Drs. Warren Guy and Donald Taves, had discovered the presence of an unidentified organic fluorine compound in human blood from different blood banks.

119.    In multiple calls, Drs. Guy and Taves asked 3M if it knew of the "possible sources" of the chemicals they found in the blood of the general population, as Dr. Guy "somewhere […] got the information that 3M's fluorocarbon carboxylic acids are used as surfactants and wanted to know if they were present in 'Scotchgard' or other items in general use by the public."

120.    3M chose to "plead ignorance" and instead "adopted a position of scientific curiosity and desire to assist in any way possible ..."

121.    That same summer, 3M submitted 10 samples of 3M's PFAS compounds to its Central Research Analytical Laboratory "in an attempt to identify the material found by [Drs.] Guy and Taves in human blood."

122.    On November 6, 1975, 3M scientist Richard Newmark of the Central Analytical Laboratory authored a report that concluded the fluorine compound discovered "resembled most closely" PFOS—a chemical manufactured only by 3M.

123.    Despite pledging assistance to Drs. Guys and Taves in the characterization of this mystery chemical, 3M declined to share their information. An internal 3M timeline explained why: "3M lawyers urge [Central Analytical Laboratory] not to release the true identity (PFOS) of the [fluorine] compound."

124.    Then, in 1981, 3M published in the peer-reviewed literature that the mystery chemical observed by Drs. Guy and Taves was not a man-made chemical at all but was instead a naturally occurring substance, a patent misrepresentation.

125.    In 1979, Defendant 3M discussed 3M's discovery of high levels of PFOS in the blood of its workers and birth defects in children of workers with one of its customers, DuPont. Both companies came to the same conclusion: that there was "no reason" to notify the EPA of the finding.[8]

126.    By the early 1980s, the industry, including Defendant 3M, suspected a correlation between PFAS exposure and human health effects.

---

[8] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf. (Last Accessed June 7, 2023)

127.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned, "we must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[9]

128.    In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[10]    That same year, 3M completed a study finding that PFOS caused the growth of cancerous tumors in rats.[11]  This finding was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[12]

129.    3M also conducted toxicology studies on rats, mice, and monkeys, which found that "[PFOS] was the most toxic of the three compounds studied and certainly more toxic than anticipated."  These studies reported "GI tract toxicity, lipid depletion of adrenals, atrophy of pancreatic exocrine cells and serous alveolar cells of the salivary glands." Indeed, 20 of the 24 rhesus monkeys who participated in this study died as a result of their exposure to PFOS.

---

[9] See Memorandum "Organic Fluorine Levels," August 31, 1984, available at available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades. (Last Accessed June 7, 2023)
[10] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[11] Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.
[12] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

130. By at least the end of the 1980s, additional research and testing performed by Defendant 3M indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOS, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

131. In or around 1998, John Buttenhoff, 3M's chief toxicologist, calculated an internal "safe reference level" of PFOS in human blood. Although his calculated safe level was thirty times higher than the median level of PFOS found in the blood of the general population, there is no evidence that 3M disclosed this important internal determination to EPA, DoD, or any other regulatory or government agency. At approximately the same time, 3M internally referred to PFOS as "insidiously toxic" and acknowledged that it should be "replaced." Still, 3M continued to produce PFOS.

132. At all relevant times, Defendant 3M knew, or reasonably should have known, among other things, that: (a) Defendant's PFAS were/is toxic; and (b) when allowed to escape into the open environment per the directions and/or instructions given by the manufacturer, PFOS and PFOA migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water wells and water supplies only at substantial expense.

133. At all times pertinent herein, Defendant 3M also knew or should have known that Defendant's PFAS presented/presents a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that Defendant's PFAS were/are known carcinogens that cause genetic damage.

134.    Notwithstanding their respective knowledge of the dangers of PFAS, including both PFOA and PFOS, Defendant negligently and carelessly: (1) developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS; (2) failed to warn users of Defendant's PFAS about the presence of, and emission of PFOS and PFOA from their products; (3) failed to direct and/or instruct users of Defendant's PFAS on the proper use of and/or disposal of Defendant's PFAS, thus improperly permitting PFOS and/or PFOA to contaminate the soil and groundwater; (4) failed to recall and/or warn users of Defendant's PFAS of the dangers of soil and groundwater contamination as a result of the standard use and disposal of their products; (5) designed products containing or degrading into PFOS and/or PFOA; and (6) failed and refused to issue the appropriate warnings and/or recalls to the users of Defendant's PFAS.

135.    In or about 2012, as a result of litigation against DuPont, a science panel created to conduct studies to confirm which diseases were linked to PFOA exposure, through the first ever large-scale (approximately 80,000 people) epidemiological study of the general population, issued its findings concluding that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

## C.    FEDERAL, STATE, AND INTERNATIONAL GOVERNMENT AGENCIES CALL FOR MONITORING AND CLEANUP OF PFAS CONTAMINATION

136.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[13]

---

[13] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

137.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFAS, called for greater regulation, restrictions, limits on the manufacture and handling of any PFAS containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[14]

138.    On May 25, 2016, the EPA released a lifetime health advisory level (HAL) for drinking water and health effects support documents for PFOS and PFOA.[15] The EPA developed the HAL to assist governmental officials in protecting public health when PFAS are present in drinking water. The EPA HAL identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFAS. These studies indicated that exposure to PFOS and PFOA over the HAL could result in adverse health effects.

139.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of fluorochemicals. The NTP concluded that both PFOA and PFOS are "presumed

---

[14] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[15] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[16]

140.    IARC similarly concluded that there is "evidence" of the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[17]

141.    California has added PFOA and PFOS to its Proposition 65 list as chemicals known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[18]

142.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 million to remediate fluorochemical contamination from military bases, as well as devoting $7 million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC")

---

[16] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

[17] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[18] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

to conduct a study into the long-term health effects of PFOA and PFOS exposure.[19]  The legislation also required that the Department of Defense submit a report on the status of developing a new military specification for AFFF that did not contain PFOS or PFOA.[20]

143.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[21]

144.    In December 2019, the United States Senate and House of Representatives passed the National Defense Authorization Act for Fiscal Year 2020 ("FY 2020 NDAA"), which introduced new prohibitions on the use of PFAS-containing AFFF for land-based applications.[22] Section 322 of the Act introduced a timeline for the phasing out of AFFF use by the military, including by requiring the Secretary of the Navy to publish a new military specification for a fluorine-free fire-fighting agent for use at all military installations by January 31, 2023. Section 322(b) and (c) then provide that Department of Defense organizations will no longer be authorized to purchase AFFF containing more than 1 part per billion of PFAS after October 1, 2023, and that after October 1, 2024, this prohibition will extend to the use of any PFAS-containing AFFF at any military installation.

---

[19] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

[20] *Id.*; *see also* U.S. Department of Defense, *Alternatives to Aqueous Film Forming Foam Report to Congress*, June 2018, *available at* https://www.denix.osd.mil/derp/home/documents/alternatives-to-aqueous-film-forming-foam-report-to-congress/.

[21] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

[22] National Defense Authorization Act for Fiscal Year 2020, S. 1790, 116th Congress (2019), *available at* https://www.govinfo.gov/content/pkg/BILLS-116s1790enr/pdf/BILLS-116s1790enr.pdf.

145.    On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act, which the agency characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS) nationwide."[23]

146.    On December 27, 2021 the EPA published its Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5") requiring all Public Water Systems nationwide that serve populations 3,300 or more persons, as well as a representative sampling of Public Water Systems serving 25 to 3,2999 persons, to test for 29 PFAS with sample collection beginning on January 1, 2023 and ending on December 31, 2025.  See 86 Fed. Reg. 73131.

147.    On June 15, 2022, the EPA released new drinking water health advisory levels (HALs) for four PFAS, including new interim HALs for PFOS and PFOA that departed significantly from the 2016 EPA HAL they replaced.[24] Specifically, EPA issued HALs of 0.004 ppt for PFOA and 0.02 ppt for PFOS,[25] which collectively accounted for only a small fraction of the combined 70 ppt HAL that preceded them.  Importantly, EPA set these interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in a water provider's system would be sufficient on its own to exceed the new levels.

---

[23] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020, *available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

[24] *See* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

[25] *Id.* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

148.    As support for its decision, EPA explained that the science had evolved since 2016 and that the new interim HALs for PFOS and PFOA were "based on human studies" that "found associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer."[26] Specifically, EPA had performed updated health effects analyses for PFOS and PFOA to provide support for the drinking water regulations the agency planned to adopt for the two chemicals under the SDWA. Based on these analyses, EPA concluded that "the levels at which negative health effects could occur are much lower than previously understood when EPA issued the 2016 health advisories for PFOA and PFOS – including near zero for certain health effects."[27]  For this reason, the agency determined there was a "pressing need to provide updated information on the current best available science to public health officials prior to finalization of the health effects assessment."[28]

149.    Because the referenced health analyses were still undergoing final review by EPA's Science Advisory Board, the agency at that time stated that the new interim HALs for PFOS and PFOA were subject to change. EPA indicated, however, that it did not anticipate any changes

---

[26] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1-2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf..

[27] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[28] EPA Office of Water, EPA Doc. No. 822-R-22-003, *INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; EPA Office of Water, EPA Doc. No. 822-R-22-004, *INTERIM Drinking Water Health Advisory: CASRN 1763-23-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf.

resulting in revised HALs for PFOS and PFOA that are greater than the 4 ppt minimum reporting level[29] that applies to Public Water Systems.[30]

150.    On September 6, 2022, EPA published a notice of proposed rulemaking seeking public comment on its plan to designate PFOS and PFOA as hazardous substances under CERCLA.[31]    Pursuant to that notice, all comments from the public were to be submitted by November 7, 2022.

151.    On January 6, 2023, the Defense Logistics Agency within the Department of Defense published a new Military Specification for "Fire Extinguishing Agent, Fluorine-Free Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Application," MIL-PRF-32725 ("F3 MilSpec") in accordance with § 332(a)(1) of the FY 2020 NDAA.[32] This new specification will govern fire extinguishing foams used by all Department of Defense organizations and will require such foams to test "non-detect" for PFAS.    The specification further requires manufacturers to "certify in writing that PFAS has not intentionally been added to the concentrate."

152.    On March 29, 2023, EPA published a notice of proposed rulemaking seeking public comment on its plan to set maximum contaminant levels ("MCLs")—legally mandated regulatory

---

[29] As EPA's website explains, the Minimum Reporting Level ("MRL") for Unregulated Contaminant Monitoring Rule (UCMR) 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.

[30] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[31] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (Sep. 6, 2022).

[32] Available on the Defense Logistics Agency's website, https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=285047.

standards under the Safe Water Drinking Act—for six PFAS chemicals.[33]   The proposed rule

would set an MCL of 4.0 ppt for PFOA and PFOS, set a hazard index for the remaining four PFAS

chemicals, and require public water systems to monitor for these PFAS, notify the public of the

levels of these PFAS, and reduce the levels of these PFAS in drinking water if they exceed the

proposed standards.  Coincident to the proposed rule-making, EPA announced final findings that

PFAS were carcinogenic and dangerous to human health.

D.     **THE IMPACT OF DEFENDANT'S PFAS ON THE DRINKING WATER WELLS AND WATER SUPPLIES OF THE PROPOSED CLASS REPRESENTATIVES AND THE PROPOSED CLASS**

153.    The drinking water wells and water supplies of the Proposed Class Representatives

have been contaminated and/or threatened to be contaminated with Defendant's PFAS, such that

Defendant's PFAS have traveled via surface water, stormwater, groundwater, etc. to contaminate

or threaten to contaminate the water wells and water supplies of the Proposed Class

Representatives.

154.    Upon information and belief, the drinking water wells and water supplies of the

Proposed Class Members have been contaminated and/or threatened to be contaminated with

Defendant's PFAS, such that Defendant's PFAS have traveled via surface water, stormwater,

groundwater, etc. to contaminate or threaten to contaminate the drinking water wells and water

supplies of the Proposed Class Members.

155.    The Proposed Class Representatives contend that any contamination and/or threat

of contamination of Defendant's PFAS to their drinking water wells and water supplies as well as

those of the Proposed Class Members requires investigation, remediation and monitoring.

---

[33] *See* PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18,638
(Mar. 29, 2023).

156.    The detection and/or presence of Defendant's PFAS and the threat of further detection and/or presence of PFAS in the drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members has resulted, and will continue to result, in significant injuries and damage to the Proposed Class Representatives and the Proposed Class.

157.    Upon information and belief, the invasion of the respective properties of the Proposed Class Representatives and Proposed Class Members with PFAS is recurring—new contamination flows regularly and constantly through the groundwater and into the property each day, resulting in new harm to the property of the Proposed Class Representatives and Proposed Class Members on each occasion.

158.    Because of the risks that Defendant's PFAS poses to human health, in June 2022, the federal EPA issued new interim lifetime drinking water health advisories of 0.0004 parts per trillion ("ppt") for PFOA and 0.02 ppt for PFOS in drinking water.

159.    The injuries to the Proposed Class Representatives and Proposed Class Members caused by Defendant's conduct constitute an unreasonable interference with, and damage to, their respective properties for which they are entitled to any and all damages provided by law.

## CLASS ACTION ALLEGATIONS

160.    Defendant's unlawful conduct, as set forth herein, caused Defendant's PFAS to enter into groundwater and surface water sources, ultimately resulting in the contamination of the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members with Defendant's PFAS.

161.    The Proposed Class Representatives and Proposed Class Members have suffered, and will continue to suffer, property damage as a result of the presence of Defendant's PFAS in their drinking water wells and/or water supplies.

162.    The Proposed Class Representatives bring this class action on behalf of themselves and all other similarly situated Public Water Systems.

163.    The proposed Class Members are defined as:

Every Active Public Water System in the United States of America that:

(a) has one or more Impacted Water Sources as of June 22, 2023; or

(b) does not have one or more Impacted Water Sources as of June 22, 2023, and

(i)    is required to test for certain PFAS under UCMR-5,[34] or

(ii)    serves more than 3,300 people, according to SDWIS.

164.    The following are specifically excluded as members of the proposed class:

(a)    Certain Public Water Systems that are associated with a specific PFAS-manufacturing facility owned by 3M.

(b)    Any Public Water System that is owned by a state government, is listed in SDWIS as having as its sole "Owner Type" a "State government," and lacks independent authority to sue and be sued;

(c)    Any Public Water System that is owned by the federal government, is listed in SDWIS as having as its sole "Owner Type" the "Federal government," and lacks independent authority to sue and be sued.

(d)    Certain Public Water Systems that have previously settled their PFAS-related Claims against 3M.

(e)    Any privately owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water for human consumption that is not a Public Water System.

---

[34] "UCMR 5" is the U.S. EPA's fifth Unregulated Contaminant Monitoring Rule, published at 86 Fed. Reg. 73131, which requires certain Public Water Systems to test for PFAS compounds. The "UCMR 5 Deadline" means (i) December 31, 2025, or (ii) such later date to which the deadline for completion of sample collection under UCMR 5 may be extended by the U.S. EPA.

165.    As used in Paragraphs 164 and 165, "Public Water System" means a system for the provision of water to the public for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves at least twenty-five (25) individuals.  As used in Paragraphs 164 and 165, a "Public Water System" shall include the owner and/or operator of that system and any public entity that is legally responsible for funding (by statute, regulation, other law, or contract), other than a State or the federal government, a Public Water System described in such Paragraph or has authority to bring a claim on behalf of such a Public Water System.

166.    This action satisfies the ascertainably, numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23.

167.    <u>Ascertainability</u>. The members of the Proposed Class are readily ascertainable without extensive and individualized fact-finding and have been identified as putative Class members by reference to publicly available information.  Each public water provider in the United States is a permitted entity that is regulated by the Environmental Protection Agency ("EPA").  The EPA assigns a unique identification number called a "PWSID" to each public water provider and maintains a centralized database that contains an inventory of all Public Water Systems in America.  This database, called the Safe Drinking Water Information System ("SDWIS"), is regularly updated with classifying information about all Public Water Systems as well as administrative contact information.  Thus, all Public Water Systems can be readily ascertained based on their registration and respective, system-specific information in the Federal SDWIS database.  Class Notice will be delivered to all eligible Public Water Systems via direct and publication notice.  Public Water Systems may also identify themselves as class members by

submitting a Claims Form and providing additional information including testing data showing PFAS detections.

168.     <u>Numerosity</u>. The members of the Class are so numerous that their individual joinder is impracticable. Over 10,000 Public Water Systems are estimated to fall within the Class definition. The Class members are geographically located across the United States, making their joinder even more impracticable.

169.     <u>Existence and Predominance of Common Questions of Law and Fact</u>. Common questions of law and fact exist as to all Proposed Class Members that predominate over any questions affecting individual class members.  All Proposed Class Members have been subject to the same unlawful conduct of the Defendant and have suffered the same resulting injuries – contamination of their drinking water wells and/or water supplies.  Questions of law or fact which are common to the Proposed Class Members, as set forth in this Complaint, predominate over questions affecting individual members because the Proposed Class Members are similarly situated victims of Defendant's common course of unlawful conduct.  Defendant's conduct similarly harmed all Proposed Class Members because Defendant 3M developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS alone or in end products manufactured with or containing PFAS that infiltrated the Proposed Class Members' drinking water wells and water supplies.  In addition, Defendant have no defenses specific to individual Class Members, and their defenses, if any, apply equally to all Proposed Class Members.  The common legal and factual questions include, but are not limited to, the following:

       a.   When the Defendant designed, manufactured, and sold Defendant's PFAS;

b.  Whether Defendant owed a duty to the Proposed Class Members to refrain from the conduct that led to the contamination of their drinking water wells and water supplies with Defendant's PFAS;

c.  Whether there is sufficient evidence that Defendant's PFAS posed/poses a risk of harm to the environment and human health;

d.  Whether Defendant knew and/or should have known that Defendant's PFAS posed/poses a risk of harm to the environment and human health;

e.  The extent to which Defendant became aware that Defendant's PFAS posed a risk of harm to the environment and human health;

f.  Whether Defendant provided adequate warnings about the potential harms associated with Defendant's PFAS;

g.  Whether Defendant provided adequate instructions for the use of Defendant's PFAS;

h.  Whether Defendant provided adequate instructions for the disposal of waste generated by Defendant's PFAS;

i.  Whether Defendant made misleading representations or omissions with respect to the environmental and health effects of Defendant's PFAS;

j.  Whether Defendant's PFAS were defectively and/or negligently designed;

k.  Whether Defendant owed the Proposed Class Members duties, including a duty to warn about the propensity of Defendant's PFAS to contaminate surface water and groundwater used by Public Water Systems;

l.  Whether Defendant failed to warn about the environmental and health risks posed by Defendant's PFAS;

m.  Whether Defendant, through their actions and omissions, breached their duties to the Proposed Class Members;

n.  whether Defendant, through their actions and omissions, directly and proximately caused the Proposed Class Members' injuries and damages;

o.  whether Defendant's conduct supports an award of statutory, exemplary and/or punitive damages; and

p.  whether the Proposed Class Representatives and Proposed Class Members are entitled to damages.

170.    The injuries sustained by the Proposed Class Representative and Proposed Class Members flow, in each instance, from a common nucleus of operative facts – Defendant's misconduct relating to Defendant's PFAS.

171.    These questions of law and fact that are common to the Proposed Class Representatives and Proposed Class Members predominate over any questions affecting them individually.

172.    <u>Typicality</u>. The claims of the Proposed Class Representatives are typical of the claims of the Proposed Class Members in that the Proposed Class Representatives, like the Proposed Class Members, own and/or operate public water systems that have been and/or are contaminated with Defendant's PFAS and/or are legally required to monitor for PFAS, and have incurred costs or will incur costs to test for and/or remove Defendant's PFAS from their respective drinking water wells and water supplies.

173.    <u>Adequacy of Representation</u>. The Proposed Class Representatives will fairly and adequately protect the interests of the Proposed Class Members. The Proposed Class Representatives have retained Proposed Class Counsel all of whom are experienced in highly complex litigation, including litigation involving public entities, widescale environmental damage, class actions and mass torts. Neither the Proposed Class Representatives nor Proposed Class Counsel have any adverse or antagonistic interests to those of the Proposed Class Members, and they will fairly and adequately protect the interests of the Proposed Class Members.  Proposed Class Counsel are unaware of any interests adverse or antagonistic to those of the Proposed Class Representatives and the Proposed Class Members.

174.    <u>Superiority</u>. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.  Significant economies of time, effort,

43

and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the judicial system and the issues raised by this action. The class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this centrally located forum is particularly convenient to the parties.

**FIRST CAUSE OF ACTION**
**PUBLIC NUISANCE**

175.    The Proposed Class Representatives reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

176.    Defendant developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the use of the drinking water from the water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members.

177.    The presence of Defendant's PFAS interferes with the use of the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members.

178.    The presence of Defendant's PFAS in the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members caused and/or continues to cause significant costs, inconvenience and annoyance to the Proposed Class

Representatives and the Proposed Class Members, who are all charged with supplying potable drinking water to residents and businesses in various locations throughout the United States.

179.    The presence of Defendant's PFAS in the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members affects a substantial number of people nationwide who rely upon the water wells and water supplies of the Proposed Class Representatives and Proposed Class Members for commercial and recreational purposes, and it interferes with the rights of the public at large to clean and safe drinking water resources and environment.

180.    An ordinary person would be reasonably annoyed and/or disturbed by the presence in public drinking water of Defendant's toxic PFAS that endanger human health and degrade water quality.

181.    The seriousness of the environmental and human health risk of Defendant's PFAS in the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members far outweighs the social utility, if any, of Defendant's conduct in developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendant's PFAS and concealing the dangers posed to human health and the environment.

182.    The Proposed Class Representatives and Proposed Class Members have suffered and will continue to suffer this particularized harm which is different from the type of harm suffered by the general public at large, as the Proposed Class Representatives and Proposed Class Members have incurred substantial costs to remove PFAS from its water supply.

183.    The Proposed Class Representatives and Proposed Class Members did not consent to the conduct that resulted in the contamination of their respective drinking water wells and water supplies.

184.    Defendant's conduct was a substantial factor in causing the harm to the Proposed Class Representatives and Proposed Class Members.

185.    Defendant knew or, in the exercise of reasonable care, should have known that the manufacture and sale of Defendant's PFAS were causing the type of contamination now found in and around the respective drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members.

186.    At all relevant times, Defendant knew or should have known that Defendant's PFAS would contaminate water supplies and were/are associated with serious illnesses and cancers in humans. Defendant, thus, knew or should have known that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water wells and water supplies.

187.    As a direct and proximate result of Defendant's creation of a public nuisance, the Proposed Class Representatives and Proposed Class Members have suffered, and continue to suffer, monetary damages to be proven at trial.

188.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**SECOND CAUSE OF ACTION**
**PRIVATE NUISANCE**

189.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

190.    The respective drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members have been contaminated by Defendant's PFAS as a direct and proximate result of the unreasonable acts and omissions of Defendant as set forth herein.

191.    PFAS contamination caused by Defendant's unreasonable acts and/or omissions has substantially damaged the respective drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members, and interfered with the ordinary safety, use, benefit, and enjoyment of their respective drinking water wells and water supplies.

192.    At all relevant times, Defendant knew or should have known that Defendant's PFAS would substantially contaminate water supplies and were/are associated with serious illnesses and cancers in humans. Defendant, thus, knew or should have known that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water wells and water supplies.

193.    As a direct and proximate result of Defendant's creation of a private nuisance, the Proposed Class Representatives and Proposed Class Members have suffered, and continue to suffer, monetary damages to be proven at trial.

194.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## THIRD CAUSE OF ACTION

## STRICT LIABILITY- DESIGN DEFECT
## CONSUMER EXPECTATION TEST

195.     The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

196.     The Proposed Class Representatives and Proposed Class Members were harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were dangerous to an extent beyond that contemplated by the ordinary consumer, defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

197.     The design of Defendant's PFAS were defective because Defendant's PFAS did not perform as safely as an ordinary consumer would have expected them to perform.

198.     Defendant's PFAS did not perform as safely as an ordinary consumer would have expected it to perform when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

199.     The drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by Defendant's PFAS.

200.     The failure of Defendant's PFAS to perform safely was a substantial factor in causing harm to the drinking water wells and water supplies of the Proposed Class Representatives and Proposed Class Members.

201.     Defendant had actual knowledge that Defendant's PFAS were causing the type of harm suffered by the Proposed Class Representatives and Proposed Class Members.

202.     Defendant also knew or should have known that Defendant's PFAS caused harm even when used as intended, instructed, and normally expected and that no third-party could prevent such harm.

203.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant were grossly negligent.

204.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

### FOURTH CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT
### RISK-BENEFIT TEST

205.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

206.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were defectively designed in that their safety risks outweighed their benefits, if any.

207.    The design of Defendant's PFAS were a substantial factor in causing harm to the Proposed Class Representatives and Proposed Class Members.

208.    The gravity of the huge environmental harm resulting from the use of Defendant's PFAS were, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

209.    The likelihood of this harm was, is, and will continue to be very high because Defendant's PFAS were toxic, cannot be contained, and do not readily degrade in the environment.

210.    Defendant knew and/or should have known that Defendant's PFAS were toxic, could not be contained, and do not readily degrade in the environment.

211.    At the time of manufacture, there were alternative safer designs that were feasible, cost effective, and advantageous to Defendant.  For example, Defendant could have developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used products not containing fluorine for use in AFFF.

212.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendant were grossly negligent.

213.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, and that these dangers significantly outweighed any benefits of Defendant's PFAS.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE - DESIGN DEFECT**

214.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

215.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were defectively designed in that they were dangerous to an extent beyond that contemplated by

the ordinary consumer, and their safety risks outweighed their benefits, if any, and they did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

216.    At all relevant times, Defendant, as commercial developers, manufacturers, formulators, distributors, sellers, transporters, storers, loaders, mixers, appliers sand/or user of Defendant's PFAS, had a duty not to place a defective product into the stream of commerce meaning that Defendant had a duty not to place into the stream of commerce any product that was unreasonably dangerous.

217.    Defendant breached that duty by developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendant's PFAS which, at all relevant times, was unreasonably dangerous.

218.    Defendant's PFAS, that were used in the vicinity of the drinking water wells and/or water supplies of the Proposed Class Representatives and/or Proposed Class Members, were defective in design and unreasonably dangerous because, among other things:

a.    Defendant's PFAS caused and/or would continue to cause extensive and persistent contamination of groundwater when used in its foreseeable and intended manner;

b.    Contamination with Defendant's PFAS in drinking water poses significant risks to public health and welfare; and

c.    Defendant failed to conduct and/or disclose adequate scientific studies to evaluate the impact of Defendant's PFAS contamination on the environment and human health.

219.    At all relevant times, Defendant's PFAS were dangerous to an extent beyond that contemplated by the ordinary consumer and posed a foreseeable risk of harm that outweighed the cost to Defendant of measures designed to mitigate that risk.

220.    Defendant knew or should have known that third parties would purchase Defendant's PFAS and use them without knowledge of their defects and hazardous consequences.

221.    Defendant knew or should have known that at the time of manufacture, that Defendant's PFAS would result in contamination of a chemical that was not biodegradable and bioaccumulated in fish, wildlife, and humans.

222.    Defendant's PFAS were purchased by third parties who used them in a reasonably foreseeable manner and without substantial change in their condition.

223.    Defendant knew or should have known that the use of Defendant's PFAS by these third parties would result in the spillage, discharge, disposal, or release of Defendant's PFAS onto land or into groundwater supplies.

224.    Defendant knew or should have known about safer, feasible alternatives to Defendant's PFAS that could be used in certain end products, such as AFFF, and the omission of those alternative designs rendered Defendant's PFAS defective.

225.    As a direct and proximate result of Defendant's negligence, the Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by the contamination of their respective drinking water wells and/or water supplies with Defendant's PFAS.

226.    Upon information and belief, Defendant knew and/or should have known that Defendant's PFAS would result in injury to the Proposed Class Representatives and Proposed Class Members.

227.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant were grossly negligent.

228.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed,

manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**SIXTH CAUSE OF ACTION**
**STRICT LIABILITY- FAILURE TO WARN**

229.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

230.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

231.    Defendant's PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

232.    The potential environmental hazard and toxicity risks of Defendant's PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendant's superior knowledge about Defendant's PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use.

233.    The potential environmental hazard and toxicity risks presented a substantial danger when Defendant's PFAS were applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.  Ordinary consumers and third-parties would not have recognized the potential risks.

234.    Defendant had strict duties not to develop, manufacture, formulate, distribute, sell, transport, store, load, mix, apply and/or use Defendant's PFAS without adequate warnings of the potential risks associated with Defendant's PFAS, which they knew or should have known resulted from the foreseeable application, use, storage and/or disposal of Defendant's PFAS.

235.    Defendant breached these duties by failing to adequately warn or instruct of the potential risks associated with the application, use and disposal of Defendant's PFAS and the dangers to drinking water wells and water supplies that were contaminated with  Defendant's PFAS.

236.    The lack of sufficient instructions or warnings was a direct, proximate and/or substantial factor in causing harm to the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members.

237.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant were grossly negligent.

238.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO WARN

239.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

240.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

241.    Defendant's PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

242.    The potential environmental hazard and toxicity risks of Defendant's PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendant's superior knowledge about Defendant's PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use.

243.    Defendant had a duty to the Proposed Class Representatives and Proposed Class Members to warn about the potential environmental hazard and toxicity risks associated with Defendant's PFAS.

244.    Defendant breached this duty by failing to adequately warn or instruct of the potential risks associated with Defendant's PFAS.

245.    Defendant had a duty to the Proposed Class Representatives and Proposed Class Members to provide sufficient instructions or warnings relating to Defendant's PFAS so as to avoid contamination of drinking water wells and water supplies throughout the United States.

246.    Defendant breached this duty by failing to provide sufficient instructions or warnings relating to Defendant's PFAS so as to avoid contamination of drinking water wells and water supplies throughout the United States.

247.    Defendant breaches were a substantial factor in causing harm to the drinking water wells and/or water supplies of the Proposed Class Representatives and Proposed Class Members.

248.    Defendant knew or reasonably should have known that users and third parties would not realize the dangers associated with Defendant's PFAS.

249.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant were grossly negligent.

250.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## EIGHTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO RECALL

251.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

252.    Defendant's PFAS were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, without adequate warning of toxicity, potential human health risks, and environmental hazards.

253.    Defendant had a duty to use reasonable care to warn or instruct about the risks associated with Defendant's PFAS.

254.    Defendant breached the duty to use reasonable care by failing to warn or instruct about the risks associated with Defendant's PFAS.

255.    Defendant had a duty to recall Defendant's PFAS when it knew or should have known about the risks associated with Defendant's PFAS.

256.    Defendant breached the duty to recall by failing to recall Defendant's PFAS when it first learned or should have learned about the risks associated with Defendant's PFAS.

257.    Defendant knew or reasonably should have known that Defendant's PFAS were dangerous or likely to be dangerous when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

258.    At all relevant times, Defendant knew or reasonably should have known that users and third parties would not realize the danger associated with Defendant's PFAS.

259.    At all relevant times, Defendant knew or reasonably should have known of the human health risks and environmental dangers presented by Defendant's PFAS.

260.    A reasonable developer, manufacturer, formulator, distributor, seller, transporter, storer, loader, mixer, applier and/or user of chemical products under the same or similar circumstances would have recalled Defendant's PFAS.

261.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which have contaminated their drinking water wells and/or water supplies.

262.    Defendant's failure to warn and/or recall Defendant's PFAS were a substantial factor in causing the harm suffered by the Proposed Class Representatives and Proposed Class Members.

263.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant were grossly negligent. 132.

264.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## NINTH CAUSE OF ACTION
## TRESPASS

265.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

266.    The Proposed Class Representatives and Proposed Class Members own and/or operate drinking water wells and/or water supplies that draw their water various Water Sources, including groundwater, aquifers and associated pumping, storage, treatment and distribution facilities.

267.    The Proposed Class Representatives and Proposed Class Members have significant property interests in the waters they appropriate and use, and they also have significant property interests in the groundwaters that supply their drinking water wells and/or water supplies.

268.    Defendant intentionally, recklessly, and/or negligently caused Defendant's PFAS to enter into the groundwaters, aquifers, and drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Proposed Class Members.

269.    The Proposed Class Representatives and Proposed Class Members did not give permission for the entry of Defendant's PFAS on to their respective properties.

270.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which have contaminated their drinking water wells and/or water supplies.

271.    Defendant's unlawful conduct was a substantial factor in causing the harm that the Proposed Class Representatives and Proposed Class Members have suffered and/or continue to suffer.

272.    Defendant's conduct relating to Defendant's PFAS lacked any reasonable care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant were grossly negligent.

273.    Defendant's conduct in trespassing on the property of the Proposed Class Representatives and Proposed Class Members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## TENTH CAUSE OF ACTION
## CIVIL CONSPIRACY

274.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 174.

275.    At all times relevant to this lawsuit, Defendant actually knew of the hazards that Defendant's PFAS posed to the environment, including the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Proposed Class Members.

276.    Beginning in the 1940s and continuing through 2002, if not later, Defendant agreed to engage in unlawful and wrongful acts with other PFAS manufacturers and/or customers, including DuPont, that caused damage to the Proposed Class Representatives and Proposed Class Members.

277.    Defendant 3M performed at least one overt act in furtherance of this conspiracy.

278.    Specifically, Defendant colluded with others manufacturers and/or customers, such as DuPont, for the avowed purpose of providing false and/or misleading information about Defendant's PFAS to the public and the government, including the EPA.

279.    The purpose of Defendant's collusion with others was unlawful because its purpose was to: (a) intentionally misrepresent to the public and the government, including the EPA, that Defendant's PFAS were safe and did not pose a risk to human health and the environment; (b) to conceal the dangers of Defendant's PFAS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the public and the government, including the EPA by, among other means, repeatedly misrepresenting how that Defendant's PFAS were being disposed of; and (c) to conceal the dangers of Defendant's PFAS from the public, including the Proposed Class Representatives and Proposed Class Members.

280.    Defendant used their considerable resources to fight legislation concerning PFOA and PFOS.

281.    As a direct and proximate result of Defendant's conspiracy with others:

(a) Defendant's PFAS posed and continue to pose a threat to the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Proposed Class Members;

(b) Defendant's PFAS contaminated and will continue to contaminate the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Proposed Class Members;

(c) Defendant's PFAS contaminated and will continue to contaminate the soil, surface and groundwater on and/or within the vicinity of the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Proposed Class Members;

(d) the Proposed Class Representatives and Proposed Class Members required and will continue to require testing and monitoring of their drinking water wells and/or water supplies for contamination with Defendant's PFAS;

(e) the Proposed Class Representatives and Proposed Class Members required or will require remediation of contamination of Defendant's PFAS or, where remediation is impracticable or insufficient, removal and disposal of the contamination;

(f) Defendant diminished the confidence of the Proposed Class Representatives and Proposed Class Members in their drinking water wells and/or water supplies as well as their use and enjoyment of same;

(g) Defendant diminished the value of the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Proposed Class Members due to actual, impending, and/or threatened contamination with Defendant's PFAS; and

(h) Defendant caused and/or will cause the Proposed Class Representatives and Proposed Class Members to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of their drinking water wells and/or water supplies.

282.    Defendant's conduct in unlawfully conspiring with each other and with others, such as DuPont, to defraud and/or mislead the Proposed Class Representatives and Proposed Class Members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**PRAYER FOR RELIEF**

WHEREFORE, the Proposed Class Representatives, on behalf of themselves and the Proposed Class Members, request that the Court enter an Order or judgment against Defendant, jointly and severally, as follows:

1. Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of the Proposed Class Representatives as Class Representatives and the Proposed Counsel as Class Counsel;

2. Compensatory and/or consequential damages according to proof including, but not limited to:

    a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of Defendant's PFAS contamination on and within the drinking water wells and water supplies of the Proposed Class Representatives and the Proposed Class Members,

    b. costs and expenses related to the past, present, and future treatment and remediation of Defendant's PFAS contamination of the drinking water wells and water supplies of the Proposed Class Representatives and the Proposed Class Members, or, in the alternative, the costs and expenses associated with and related to the removal and disposal of such contamination; and

    c. costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within the drinking water wells and water supplies of the Proposed Class Representatives and the Proposed Class Members; and

3. Exemplary and/or Statutory Damages;

4. Punitive damages, where available;

5. Costs, disbursements and attorneys' fees of this lawsuit;

6. Pre-judgment and post-judgment interest on the monetary relief ; and

7. Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

The Proposed Class Representatives demand a trial by jury.

Dated: June 29, 2023

Respectfully Submitted,

/s/ Michael A. London
Michael A. London
Douglas and London PC
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com

/s/ Paul J. Napoli
Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
Tel: (833) 271-4502
Fax: (646) 843-7603
pnapoli@nsprlaw.com

/s/ Scott Summy
Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan
Fegan Scott LLC
150 S. Wacker Drive, 24h Floor
Chicago, IL 60606
312-741-1019
beth@feganscott.com

*Proposed Class Counsel*