IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) | Master Docket No.: 2:18-mn-2873-RMG |

| | | |
|---|---|---|
| CITY OF CAMDEN, *et al.*, | ) ) ) | Civil Action No.: 2:23-cv-3147-RMG |
| *Plaintiffs,* | ) ) | |
| *-vs-* | ) ) | |
| 3M Company, | ) ) | |
| *Defendant.* | ) ) | |

## ORDER AND OPINION

Before the Court is Class Counsel's motion for final approval of class settlement and final certification of the settlement class (Dkt. No. 4273) and the Parties' joint motion for entry of final order and judgment (Dkt. No. 4605). On August 29, 2023, the Court preliminarily approved the Settlement Agreement reached between Plaintiffs the City of Camden, City of Brockton, City of Sioux Falls, California Water Service Company, City of Del Ray Beach, Coraopolis Water & Sewer Authority, Township of Verona, Dutchess County Water & Wastewater Authority and Dalton Farms Water System, City of South Shore, City of Freeport, Martinsburg Municipal Authority, Seaman Cottages, Village of Bridgeport, City of Benwood, Niagara County, City of Pineville, and City of Iuka (collectively "Plaintiffs") and Defendant the 3M Company ("Defendant" or "3M"—together with Plaintiffs the "Parties"). (Dkt. No. 3626). The Court conducted a Fairness Hearing on February 2, 2024 regarding the proposed Settlement Agreement. For the reasons set forth below, the Court grants Class Counsel's motion for final approval and the Parties' joint motion for entry of final order and judgment.

1

## Pertinent Factual Background[1]

On December 7, 2018, the Judicial Panel on Multidistrict Litigation (the "JPML") centralized in this Court approximately 90 civil actions from eight judicial districts involving claims that aqueous film-forming foams ("AFFF") had contaminated local ground water and drinking water supplies in numerous communities across the United States. In its transfer order, the JPML noted:

> These actions thus share factual questions concerning *the toxicity of PFOA and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants conspired or cooperated to conceal the dangers of PFOA and PFOS in their products.*

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (JPML 2018).

Following the creation of this multidistrict litigation ("MDL"), and pursuant to Case Management Orders 2 and 3, the Court appointed Plaintiffs' Co-Lead Counsel, the initial slate of Plaintiffs' Executive Committee ("PEC") members, and Advisory Counsel to the PEC. (Dkt. No. 4273-1 at 13). Over the next four and half years, Plaintiffs in this MDL, led by Plaintiffs' Co-Lead Counsel and the PEC, conducted approximately "431,158.9 hours of work . . . includ[ing], *inter alia*, MDL oversight and administration, bellwether efforts, general liability efforts, significant legal briefing efforts including successfully overcoming the government contractor defense, service of nine (9) general expert reports and twelve (12) case-specific expert reports, and one (1) expert report with a general sub-part and three (3) case-specific sub-parts, as well as multiple supplemental reports." (*Id.* at 14-15).

Plaintiffs in the MDL also prepared *City of Stuart, Fla. v. 3M Company, et al.*, Case No. 2:18-cv-3487-RMG, for trial, which the Court stayed on June 5, 2023 to allow Plaintiffs and 3M,

---

[1] Unless otherwise noted, capitalized terms have the same meaning as in the Settlement Agreement and all citations are to the docket in 2:18-mn-2873-RMG.

the sole remaining Defendant in *Stuart*, to work towards a global resolution of public water district cases. (Dkt. No. 3256); (Dkt. No. 4273-1 at 15).

On June 1, 2023—four days before trial—with the assistance and oversight of Court-appointed mediator Judge Layn Phillips (Ret.), the Parties signed a memorandum of understanding. (Dkt. No. 4080-1 at 18). As the Parties note, however, settlement discussions had begun between 3M and the MDL Plaintiffs three years prior in April 2021. (Dkt. No. 4273-1 at 16).

On July 12, 2023, on behalf of themselves and all other similarly situated Public Water Systems ("PWS"), Plaintiffs filed a class action complaint against 3M claiming one or more of the following types of damages: (1) the costs of testing and monitoring of the ongoing contamination of their Drinking Water wells and supplies; (2) the costs of designing, constructing, installing and maintaining a filtration system to remove or reduce levels of PFAS detected in Drinking Water; (3) the costs of operating that filtration system; and (4) the costs of complying with any applicable regulations requiring additional measures. (*City of Camden, et al. v. 3M Co.*, C.A. No. 2:23-cv-3147-RMG, Dkt. No. 2). The Parties intended that the complaint be used as the mechanism for a class-wide settlement and the complaint identifies each Class Representative, defines the Settlement Class, and states the claims intended to become Released Claims and concluded by the Final Judgment. *See* (Dkt. No. 4273-1 at 17).

On August 29, 2023, the Court granted preliminary approval of the Parties' proposed settlement. (Dkt. No. 3626) (the "PAO"). The PAO established that the objection period would end on November 11, 2023 and that the last day of the opt-out period would be December 11, 2023. Class Counsel were directed to file its motion for attorneys' fees and costs and its papers in support of final approval of the Settlement Agreement by December 18, 2023. Responses and/or objections were to be filed by January 2, 2024 and Class Counsel's responses to any such responses

and/or objections were to be filed by January 9, 2024. The Final Fairness Hearing was set for February 2, 2024.

On October 26, 2023, the Court granted, (Dkt. No. 3861), the Parties' motion to supplement the Settlement Agreement with their "Joint Interpretative Guidance on Interrelated Drinking-Water Systems," (Dkt. No. 3856-1) (the "Interrelated Guidance").

On November 2, 2023, the Court appointed Matthew Garretson as Special Master. (Dkt. No. 3886).

On November 7, 2023, the Court granted, (Dkt. No. 3929), the Parties' motion to supplement the Settlement Agreement with the "Parties' Joint Interpretive Guidance on Entities that Own and/or Operate Multiple Public Water Systems," (Dkt. No. 3918-1) (the "Multiple PWS Guidance").

On November 17, 2023, the Court granted, (Dkt. No. 4059), the Parties' motion to supplement the Settlement Agreement with the Parties' "Joint Interpretative Guidance on Federally Recognized Indian Tribes and Public Water Systems." (Dkt. No. 3964).

On December 4, 2023, the Court granted, (Dkt. No. 4132), the Parties' motion to supplement the Settlement Agreement with "Interpretive Guidance on Certain Release Issues." (Dkt. No. 4107-1).

On January 23, 2024, the Court granted the Parties' motion to amend the Settlement Agreement to align with Amended Exhibit P. (Dkt. No. 4372).

On January 29, 2024, the Court granted the Parties' motion to amend the PAO's Stay and Injunction provision and further granted the Parties' motion to issue "Joint Interpretative Guidance on How to Withdraw an Opt-Out Election After It Was Submitted." (Dkt. No. 4400).

On February 2, 2024 the Court conducted a Fairness Hearing. Transcript of Fairness Hearing, (Dkt. No. 4452).

On February 15, 2024, the Court granted the Parties' motion to amend the Settlement Agreement to clarify that the withdrawal of a request for exclusion did not permit the Eligible Claimant to file an objection or revive a previously asserted objection. (Dkt. No. 4490).

On February 29, 2024, the Court granted the Parties' motion to extend the time by which Eligible Claimants could withdraw their opt-out election. (Dkt. No. 4577) (extending deadline to March 15, 2024).

On March 22, 2024, Special Master Garretson filed a declaration stating that, after accounting for 48 PWS which had recently rejoined the Settlement Agreement, 897 PWS validly opted out of the Settlement Agreement. (Dkt. No. 4728). This figure represents roughly 7.5% of potential class members.

## Summary of Settlement Agreement

As provided for in the Settlement Agreement, 3M has agreed to pay or cause to be paid a Settlement Amount of between $10.5 and $12.5 billion in exchange for receiving releases, covenants not to sue, and dismissals from Settlement Class Members. (Dkt. No. 4273-1 at 19).

The preliminarily approved Settlement Class consists of:

> Every Active Public Water System in the United States of America that—(a) has one or more Impacted Water Sources as of the Settlement Date (June 22, 2023); or (b) does not have one or more Impacted Water Sources as of the Settlement Date, and (i) is required to test for certain PFAS under UCMR-5 [Fifth Unregulated Contaminant Monitoring Rule], or (ii) serves more than 3,300 people, according to SDWIS [Safe Drinking Water Information System].

(*Id.* at 20). Subsection (a) Settlement Class members are referred to as "Phase One" Class Members and subsection (b) Settlement Class members are referred to as "Phase Two" Class Members. (*Id.* at 22). For reasons explained *infra*, the Parties have allocated 55% of the Settlement Amount to Phase One Class Members and 45% to Phase Two Class Members.

The following are excluded from the Settlement Class: the Public Water Systems associated with specific PFAS-manufacturing facility owned by 3M, as set forth in Exhibit G to

the Settlement Agreement; any Public Water System that is owned by a State government, is listed in SDWIS as having its sole "Owner Type" a "State government," as set forth in Exhibit H to the Settlement Agreement, "and lacks independent authority to sue and be sued"; any Public Water System that is owned by the federal government, is listed in SDWIS as having as its sole "Owner Type" the "Federal government," as set forth in Exhibit I to the Settlement Agreement, "and lacks independent authority to sue and be sued"; the Public Water Systems that are listed in Exhibit J to the Settlement Agreement having previously settled their PFAS-related Claims against 3M; and any privately owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water that is not a Public Water System. (*Id.* at 20).

The Phase One Funds are broken down into three distinct funds: the Phase One Action Fund, the Phase One Supplemental Fund, and the Phase One Special Needs Fund. Similarly, the Phase Two Funds are separated into four separate payment sources: the Phase Two Action Fund, the Phase Two Supplemental Fund, the Phase Two Special Needs Fund, and the Phase Two Testing Compensation Fund. (*Id.* at 24-25).

The Phase One and Phase Two Action Funds will compensate Phase One and Phase Two Qualifying Class Members that have timely submitted a Claims Form and performed the requisite testing for each of its Impacted Water Source(s). The Claims Administrator will enter the test results and relevant information provided on the Claims Form into the mathematical formula set forth in the Allocation Procedures to score each Impacted Water Sourced owned and/or operated by a Qualifying Class Member. (*Id.*).

Phase One Qualifying Class Members (i.e. those with a Measurable Concentration of PFAS before June 22, 2023) are not required to retest Impacted Water Source(s) that have PFAS detections, but they are required to perform Baseline Testing on each of their Water Sources that either have not

been tested for PFAS or were tested for PFAS before January 1, 2019, and the test did not result in a Measurable Concentration of PFAS. By contrast, all Phase Two Qualifying Class Members will have to perform Baseline Testing. Failure to test and submit Qualifying Test Results for Water Sources will disqualify Water Sources from consideration for present and future payments. (*Id.*).

Those Qualifying Class Members with a detection will receive compensation from the appropriate Action Fund for each Impacted Water Source. Water Sources without a detection will remain eligible to receive compensation from the Phase One and Phase Two Supplemental Funds through December 31, 2030, if later testing results in a PFAS detection. (*Id.* at 25).

The flow rates and PFAS concentrations of each Impacted Water Source, obtained from the Qualifying Class Settlement Members' Claims Forms and supporting documentation, will be used by the Claims Administrator to formulaically calculate a "Base Score for each Impacted Water Source based on the Allocation Procedures." These Base Scores will then be adjusted or "bumped," depending on whether the Impacted Water Source's concentration levels exceed the proposed federal or applicable state Maximum Contaminant Levels ("MCLs"), whether the Qualifying Settlement Class Member had Litigation relating to the Impacted Water Source pending at the time of Settlement, and whether the Qualifying Settlement Class Member was one of the Public Water Provider Bellwether Plaintiffs. For Phase One Qualifying Class Members, the Claims Administrator will then divide an Impacted Water Source's Adjusted Base Score by the sum of all Adjusted Base Scores for the Phase One Action Fund, to arrive at each Impacted Water Source's percentage of the Phase One Action Fund. This percentage will be multiplied by the total Phase One Action Fund to provide the Settlement Award for each Impacted Water Source. (*Id.* at 25-26).

Because the Allocation Procedures require the information solicited in the Claims Forms to calculate Base Scores, and all Base Scores are required to calculate individual Settlement Awards, "no Qualifying Settlement Class Member's Allocated Amount will be determinable until all

applicable Claims Forms are submitted, analyzed, and processed by the Claims Administrator." When these Settlement Awards are determined and notification of the Settlement Award is provided, each Qualifying Settlement Class Member, Class Counsel and/or 3M, may submit a request for reconsideration to the Special Master within the applicable deadlines, if an error in calculation can be established. (*Id.* at 26-27).

The Parties state their desire is that a Phase Two Qualifying Class Member receive the same approximate Settlement Award as a Phase One Qualifying Class Member with the same Adjusted Base Score, except for the inflation adjustment. (*Id.* at 26). Accordingly, the Claims Administrator will individually calculate the amount for each Impacted Water Source owned or operated by a Phase Two Qualifying Class Members to approximate, as closely as is reasonably possible, the amount that each Impacted Water Source would have been allocated had it been a Phase One Qualifying Class Member. "However, there is a distinction between Allocated Amounts calculated under Phase One and Phase Two – Allocated Amounts under Phase Two are subject to the Phase Two Floor and/or Phase Two Cap." (*Id.* at 27).  Class Counsel explains that "if the total payments from the Phase Two Funds would be less than $3,625,000,000.00 (the 'Phase Two Floor'), the Claims Administrator must increase each Phase Two Qualifying Class Member's Allocated Amount by the same percentage, so that the total payment from the Phase Two Action Fund will meet the Phase Two Floor. Conversely, if the total payments from the Phase Two Funds would be more than $5,625,000,000.00 (the 'Phase Two Cap'), the Claims Administrator must reduce each Phase Two qualifying Class Member's Allocated Amount by the same percentage, so that the total payments from the Phase Two Action Fund will meet the Phase Two Cap." (*Id.* at 27-28) (noting that if the Phase Two Floor or Phase Two Cap is applied, the Settlement Agreement "contains an equalization provision such that the Claims Administrator, with the Special Master's approval, may shift funds from Phase One to Phase Two" or vice versa to "promote equity" between the phases). The Claims Forms submission deadline for

the Phase One Action Fund is sixty (60) calendar days after the Effective Date. The deadline for the Phase Two Action Fund is July 31, 2026, which is seven months after the UCMR 5 testing deadline. (*Id.* at 28).

The Supplemental Funds compensate Qualifying Settlement Class Members that: (1) have an Impacted Water Source with Qualifying Test Results showing no Measurable Concentration of PFAS and because of later testing obtain a Qualifying Test Result showing Measurable Concentrations of PFAS; or (2) have an Impacted Water Source that did not exceed the proposed federal or an applicable state MCL at the time they submitted their Claims Forms and because of later testing obtain a Qualifying Test Result that exceeds an applicable MCL. (*Id.* at 28).

For each Impacted Water Source, the Claims Administrator will approximate, as closely as is reasonably possible, the Allocated Amount that each Impacted Water Source would have been allocated had it been in the Action Fund with the later PFAS concentration, and shall issue funds from the Supplemental Funds in amounts that reflect the difference between the Impacted Water Source's Settlement Award and what the Qualifying Class Member has already received, if anything, for the Impacted Water Source. (*Id.*). The deadline for Claims Form submission for both the Phase One and Phase Two Supplemental Funds is December 31, 2030.

The Phase One and Phase Two Special Needs Funds will compensate Qualifying Settlement Class Members who have already spent money to address PFAS detections in their Impacted Water Sources, such as by taking wells offline, reducing flow rates, drilling new wells, pulling water from other sources and/or purchasing supplemental water. (*Id.* at 29).

A Phase One Special Needs Fund Claims Form must be submitted no later than 45 days after the deadline for submission of the PWS Claims Form. Once all Phase One Special Needs Fund Claims Forms are timely received, the Claims Administrator will review them and determine which Phase One Qualifying Settlement Class Members shall receive additional compensation and the

amount of compensation. The Claims Administrator will recommend the awards to the Special Master who must review and ultimately approve or reject them. Phase Two Special Needs Funds claims will employ an identical process except that the deadline for submissions is August 1, 2026. (*Id.*).

The Phase Two Testing Compensation Fund was "created to allow PWS with no evidence of PFAS contamination prior to June 22, 2023, to conduct Baseline Testing that could help them establish eligibility for payments from the Phase Two Fund." "Although UCMR 5 requires PWS to test for PFAS, the rule requires only that a PWS test once in its *distribution* system. The Phase Two Testing Compensation Fund pays for more thorough testing: it allows for Phase Two Qualifying Class Members to receive compensation for testing each Water Source." (*Id.* at 30). Thus, "Phase Two Qualifying Settlement Class Members will be able to gather far more data regarding PFAS and, critically, will be able to seek compensation for those new detections in Phase Two." (*Id.*). Payments from this fund are limited to the actual cost of testing and cannot exceed $800 per sample, absent extraordinary circumstances. The deadline for submitting Phase Two Testing Compensation Claims Forms is January 1, 2026, which coincides with the UCMR 5 testing deadline of December 31, 2025. (*Id.* at 30).

## Analysis

### I.    Class Action Fairness Act of 2005

The Class Action Fairness Act, 28 U.S.C § 1711 *et seq.* ("CAFA"), requires settling defendants to serve notice of a proposed settlement on the "appropriate" state and federal officials after a proposed class action settlement is filed with the court. 28 U.S.C. § 1715(b). The Court finds 3M has satisfied CAFA's notice requirement. (Dkt. No. 4273-5 at 3).

### II.    Settlement Class Certification

Under Federal Rule of Civil Procedure 23, to certify a class action, the class must meet the

four Rule 23(a) prerequisites and fit within one of the three Rule 23(b) categories. *See Boyd v. Coventry Health Care Inc.,* 299 F.R.D. 451, 457–58, (D. Md. 2014). Class Counsel seeks certification under Rule 23(b)(3). (Dkt. No. 4273-1 at 45).

When parties seek certification for settlement under Rule 23(b)(3), although the "district court need not inquire whether the case, if tried, would present intractable management problems" under Rule 23(b)(3)(D), the other Rule 23 requirements "demand undiluted, even heightened, attention." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

### a.  Ascertainability

Although not self-evident on the face of Fed. R. Civ. P. 23, it is inherent in the concept of class certification that there must be a "readily identifiable" set of putative class members. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). This is referred to as "ascertainability." *Id.* Plaintiffs need not be able to identify each and every class member at the time of class certification, but class members must be identifiable by reference to objective criteria without "extensive and individualized fact-finding or 'mini-trials[.]'" *Id.* (citation omitted).

Here, the proposed Settlement Classes meet this requirement because the putative Settlement Class Members are objectively described, and many are readily identifiable, ascertainable by reference to publicly available information and, if necessary, confirmatory testing.

### b.  Numerosity

Numerosity exists when the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no set minimum number or "mechanical test for numerosity." *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (citing *Kelley v. Norfolk & Western Ry. Co.*, 584 F.2d 34 (4th Cir. 1978)).

The numerosity requirement is easily met by the putative Settlement Class, which is projected to include over 12,000 PWS. (Dkt. No. 4273-1 at 46). *See, e.g.*, *Gunnells v. Healthplan*

*Servs., Inc*., 348 F.3d 417, 425 (4th Cir.2003) (noting with approval the district court's observation that "1400 employees plus their families" "easily" satisfied Rule 23(a)(1)'s numerosity requirement).

### c. Commonality

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that a proposed class action have "the capacity . . . to generate answers" that "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011). Minor factual variances will not necessarily preclude commonality, so long as the claims arise from the same general set of facts and "the class members share the same legal theory." *Mitchell–Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006); *see also Jeffreys v. Commc'ns Workers of Am., AFL–CIO*, 212 F.R.D. 320, 322 (E.D. Va. 2003). Plaintiffs certifying a class under Rule 23(b) carry a related, but more demanding, burden of proving that these common questions of law or fact not only exist, but also "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Because the predominance inquiry is "more stringent," that analysis may "subsume[ ] . . . or supersede[ ]" the Rule 23(a)(2) commonality analysis. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods., Inc.*, 521 U.S. at 609).

The Court finds that the putative Settlement Class meets this requirement. Plaintiffs' claims arise from similar, if not identical, allegations that 3M knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS. (Dkt. No. 4273-1 at 47). Likewise, Plaintiffs and the preliminarily approved Settlement Class Members have all alleged that 3M failed to warn users, bystanders, or public agencies of the risks associated with their products that contained PFAS. (*Id.* at 47-48). Plaintiffs and the Settlement Class Members' claims arise out of

a common core of salient facts relevant to 3M which, for reasons stated *infra*, predominate over questions concerning only individual members such as damages. *See also* (C.A. No. 2:23-cv-3147-RMG, Dkt. No. 204 at 1-2) (withdrawing the City of DuPont and the City of Vancouver's objections to "class certification").

### d. Typicality

The typicality prerequisite requires that the class representative "be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart*, 255 F.3d at 146 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "Nevertheless, the class representatives and the class members need not have identical factual and legal claims in all respects." *Fisher v. Va. Elec. and Power Co.*, 217 F.R.D. 201, 212 (E.D. Va. 2003). The key inquiry is whether the "class representatives assert claims that fairly encompass those of the entire class, even if not identical." *Id.* To satisfy typicality, the plaintiff seeking to certify the class must show: "(1) that their interests are squarely aligned with the interests of the class members; and (2) that their claims arise from the same events and are premised on the same legal theories as the claims of the class members." *Jeffreys*, 212 F.R.D. at 322.

The Court finds that Plaintiffs' claims are typical of those of the putative Settlement Class Members. Plaintiffs, like the Settlement Class Members, are PWS that have asserted claims for actual or threatened injuries caused by PFAS contamination. (Dkt. No. 4273-1 at 49). In addition, Plaintiffs and the Settlement Class Members rely on the same common core of facts to allege that 3M knowingly sold defective PFAS and failed to warn of those defects, leading to the actual or threatened contamination of their respective Water Sources. (*Id.*). Plaintiffs and the Settlement Class Members also assert a common damages theory that seeks recovery of the costs incurred in testing, monitoring, remediating and/or treating their Water Sources, either to monitor for PFAS contamination or to remediate existing PFAS contamination from their Drinking Water. (*Id.*); *see*

*also* (C.A. No. 2:23-cv-3147, Dkt. No. 204 at 1-2).

### e.  Adequacy of Representation

Lastly, the adequacy requirement is met when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are "qualified, experienced, and generally able to conduct the litigation." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 238 (S.D.W. Va. 2005). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc.*, 521 U.S. at 625.

Plaintiffs meet this requirement.  The Court finds that the Class Representatives have no interests antagonistic to those of the class, (Dkt. No. 4273-1 at 50) and Class Counsel are easily qualified, experienced, and able to conduct this litigation.  Plaintiffs have structured the settlement into appropriate subclasses with separate funds, the funding of which was based on expert analysis no objector substantively refutes on the merits. *See* Declaration of Timothy G. Raab, (Dkt. No. 3370-13) (describing why the Settlement Amount was allocated 55% toward Phase One and 45% toward Phase Two).  Ms. Elisabeth Fegan has also been appointed as Class Counsel for Phase Two claimants to "ensure their equal treatment vis-à-vis the Phase One Class Members," which the structure of the Settlement Agreement attests to. (Dkt. No. 4273-1 at 51); *see also* (C.A. No. 2:23-cv-3147-RMG, Dkt. No. 204 at 1-2).

### III.    Rule 23(b)(3)

In addition to meeting the threshold requirements of Rule 23(a), a plaintiff seeking class certification must prove the case qualifies as one of the three Rule 23(b) class types. Here, Plaintiffs seek to qualify as a Rule 23(b)(3) class, which requires proof that: (1) common questions of law or fact predominate, and (2) a class action is the superior method of adjudication. Rule 23(b)(3).

The Court finds that common questions of law or fact predominate because Plaintiffs and Settlement Class Members are PWS that claim to have been injured by a common course of

conduct that resulted in substantially similar damages to Plaintiffs and the putative Class Members. (Dkt. No. 4273-1 at 52). While claimants' damages may differ, these differences pale in comparison to the otherwise common questions of law and fact that concern 3M. *See also* (C.A. No. 2:23-cv-3147, Dkt. No. 204 at 1-2).

The Court further finds a class action to be the superior method of settling this case. (Dkt. No. 4273-1 at 51-53). The alternative to the efficiency achieved through the proposed settlement would be for federal judges in 94 judicial districts to adjudicate—over 12,000 times—claims directly tied to 3M's alleged common course of conduct. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2021 U.S. Dist. LEXIS 16470, *6 (D.S.C. Jan. 25, 2021) ("*Campbell*") ("The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court. Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."). Other factors strongly favor class wide resolution of this matter, including the expense, burden, risk, and length of trial and appellate proceedings were Settlement Class Members to pursue individual litigation. *Stillmock*, 385 F. App'x at 275; *Campbell*, U.S. Dist. LEXIS 16470, at *13 ("Similarly, there is a sufficient desirability to concentrate the litigation in the forum given its familiarity with the relevant issues as the transferee Court.").

## IV.    Settlement Agreement

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval" and Rule 23(e)(2) requires that the Court find that a proposed settlement is "fair, reasonable, and adequate." Under Rule 23(e)(2), as amended in 2018, the Court considers whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2).  The primary concern addressed by this requirement is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations. *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

The Fourth Circuit "has developed multifactor standards for assessing whether a class-action settlement is 'fair, reasonable, and adequate' under Rule 23(e)(2)." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020).[2]  The Fourth Circuit has specified the following factors for assessing fairness: (1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of the class action litigation. *Id.*  While the Fourth Circuit has "not enumerated factors assessing a settlement's reasonableness," it has specified factors for

---

[2] The Fourth Circuit's "factors for assessing class-action settlements almost completely overlap with the new Rule 23(e)(2) factors." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 484 & n.8 (4th Cir. 2020); *see also Herrera v. Charlotte Sch. of L., LLC*, 818 F. App'x 165, 176 n.4 (4th Cir. 2020) ("Federal Rule of Civil Procedure 23(e)(2) has been amended and now sets forth factors for the district court to assess in evaluating fairness, reasonableness, and adequacy. Recognizing that, this Court continues to apply its own standards as they almost completely overlap with the new Rule 23(e)(2) factors, rendering the analysis the same.").

assessing its adequacy, including: (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement. *Id.*

The Court first articulates its reasoning for finding that the Settlement Agreement satisfies Rule 23(e)(2) and *Jiffy Lube* before addressing objections on these points.

### a. Fairness

In determining a settlement's fairness, the Court considers: "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation." *Lumber Liquidators*, 952 F.3d at 484 (citing *Jiffy Lube*, 927 F.2d at 159). "The fairness analysis is intended primarily to ensure that a 'settlement [is] reached as a result of good-faith bargaining at arm's length, without collusion.'" *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015) (citing *Jiffy Lube*, 927 F.2d at 159); *see also Edelen v. Am. Residential Servs., LLC*, Civ. No. DKC 11-2744, 2013 WL 3816986, at *8 (D. Md. July 22, 2013) ("The 'fairness' prong is concerned with the procedural propriety of the proposed settlement agreement"); Rule 23(e)(2)(B).

The Court concludes that all factors weigh in favor of finding the settlement is fair. The settlement was reached as a result of good-faith bargaining at arm's length without collusion; nothing in the record suggests otherwise. The posture of the MDL and the extent of discovery weigh in favor of this finding: this MDL has been, and continues to be, vigorously litigated by all parties, and the Parties only reached a settlement regarding PWS after extensive discovery was completed and summary judgment and motions in limine were ruled on in *City of Stuart*. Further,

settlement only occurred with the help of a court-appointed mediator, Judge Layn Phillips (Ret.), and only after years of negotiation. Last, Class Counsel are undoubtedly experienced and highly qualified mass tort litigators.

### b. Adequacy

In assessing the adequacy of a proposed settlement, the Court considers: "(1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[ ] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement." *Lumber Liquidators*, 952 F.3d at 484 (citing *Jiffy Lube*, 927 F.2d at 159). "The most important factors in this analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses." *Sharp Farms v. Speaks*, 917 F.3d 276, 299 (4th Cir. 2019). The focus of the adequacy prong is "the agreement's substantive propriety." *Edelen*, 2013 WL 3816986, at *8 (citations and quotations omitted); Rule 23(e)(2)(C).

The Court concludes that the proposed settlement is adequate. The first two factors—the relative strength of Plaintiffs' case on the merits and the existence of any difficulties of proof or strong defenses the Plaintiffs are likely to encounter if the case goes to trial—support this finding. While Plaintiffs are confident in the strength of their allegations and supporting evidence, so is 3M. *See* Declaration of Court-Appointed Mediator Layn Phillips, (Dkt. No. 3370-7) ("To the extent that the settlement negotiations were difficult and contentious, that was only because all involved held firm to their convictions that they had the stronger factual and legal arguments on issues relevant to liability, damages, and otherwise, leading to robust debates on virtually every aspect of the settlement, including the ultimate outcome of motions, trials, and appeals if a negotiated agreement was not achieved. Further, all involved recognized that both sides had the

18

resources and determination to prosecute and defend this action for many more years."). As all serious counsel must admit, "[p]laintiffs' ability to prevail on the merits is uncertain. The Settlement confers relief that might well not be achievable through continued litigation." *Gray v. Talking Phone Book*, 2012 U.S. Dist. LEXIS 200804, at *16 (D.S.C. Aug 20, 2012); *see* (C.A. No. 2:23-cv-3147-RMG, Dkt. No. 221 at 35 *et seq.*) (testimony by Class Counsel at Final Fairness Hearing describing difficulties associated with defendant specific product identification and the existence of potentially strong defenses such as statutes of limitations and repose).

The third and fourth factors—the anticipated duration and expense of additional litigation and Defendant's solvency—also favor of settlement. If not approved, Settlement Class Members would be years—if not a decade—away from litigating and reaching finality in their own cases despite the likely need to "comply with the pending EPA MCLs for PFAS" very soon. *See* (Dkt. No. 4273-1 at 64). Further, preparing an individual case for trial would require engaging expert witnesses "at a cost totaling hundreds of thousands of dollars," and any judgment for a Class Member would be subject to lengthy appeals while the Settlement Agreement provides immediate results and benefits to Settlement Class Members. (*Id.* at 64-65). Also, though there is no indication 3M is insolvent, other defendants in this MDL have filed for bankruptcy because of this litigation. *See* Suggestion of Bankruptcy for Kidde-Fenwal, Inc., (Dkt. No. 3122) (noting assets in the $100-$500 million range and liabilities in the $1,000,000,001 to $10 billion range).

The lack of substantive opposition to the Settlement Agreement also weighs in favor of finding it adequate. Of roughly 12,000 Settlement Class Members, approximately 897 PWS opted out, representing only 7.5% of the class. (Dkt. No. 4728 at 1-2). Additionally, only 7 parties filed objections. (Dkt. No. 4273-1 at 75). As discussed *infra*, these objections are largely duplicative and, more importantly, lack merit. The Court thus finds the degree of opposition to the Settlement Agreement small. Accordingly, this factor weighs in favor of approval. *See, e.g., McAdams v.*

*Robinson*, 26 F.4th 149 (4th Cir. 2022) (affirming district court's approval of a settlement where only 0.04% of the class objected); *Herrera v. Charlotte Sch. of Law, LLC*, 818 Fed. App'x. 165 (4th Cir. 2020) (affirming district court's approval of settlement where only 4% of the class objected); *In re The Mills Corp. Securities Litigation*, 265 F.R.D. 246, 257 (E.D. Va. 2009) (noting that "an absence of objections and a small number of opt-outs weighs significantly in favor of the settlement's adequacy.").

### c. Reasonableness

The Fourth Circuit has not enumerated factors for assessing reasonableness. *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 527 (4th Cir. 2022). However, it has "suggested that assessing whether a class settlement is 'reasonable' involves examining the amount of the settlement." *Id.* (citing *Sharp Farms v. Speaks*, 917 F.3d 276, 303–04 (4th Cir. 2019)). "To the extent that reasonableness does any work not already performed by one of the other Rule 23(e)(2) requirements, [ ] it at least ensures that the amount on offer is commensurate with the scale of the litigation and the plaintiffs' chances of success at trial." *Id.* The Fourth Circuit has "never required [ ] an estimate" of what the class members would have received had they prevailed at trial. *McAdams*, 26 F.4th at 160. Further, the Court is not required to "decide the merits of the case nor substitute its judgment of what the case might be worth for that of class counsel," rather "the court must at least satisfy itself that the class settlement is within the 'ballpark' of reasonableness." *Id.* (quotations and citations omitted).

The pertinent agreement is the Settlement Agreement, Rule 23(e)(2)(C)(iv), under which 3M will pay $10.5 to $12.5 billon to settle the claims of roughly 12,000 PWS across the United States. The only other agreement between the Parties concerns Defendant's Walk-Away rights and this document was filed under seal. (C.A. No. 2:23-cv-3147-RMG, Dkt. No. 11). As described above, putative Class Members are divided between Phase One and Phase Two Class Members.

20

Phase One Qualifying Class Members will be allocated 55% of the Settlement Amount while Phase Two Qualifying Class Members will be allocated 45% of the amount.

The Parties arrived at this division with the assistance of Timothy G. Raab, specialist in Disputes and Investigation, and a Managing Director at Alvarez and Marsal. (Dkt. No. 3370-13 at 1-4). Raab's analysis was based upon public information provided by Class Counsel and included: (a) state data showing PFAS detections and non-detections in certain PWS; (b) the EPA's Third Unregulated Contaminant Monitoring Rule ("UCMR 3") data showing PFAS detections and non-detections of the PWS that were subject to UCMR 3; (c) information regarding the PWS that are currently subject to UCMR 5 and applicable state or federal laws; and (d) PWS identified in SDWIS. Based on this information, Raab identified the known Phase One members of the Settlement Class and compared them to the number of PWS that either have not yet tested for PFAS or have not reported a PFAS detection and would also meet the proposed Phase Two Class definition. From this analysis, Raab determined that based on mathematical principles it is more likely than not that 69% of the members of the Settlement Class would meet the Phase One Class definition and 31% would meet the Phase Two Class definition. To be conservative and account for any discrepancies in data, he then concluded that it would be fair, reasonable and adequate to estimate that 55% of the members of the Settlement Class would fall under the Phase One Class definition and 45% would fall under the Phase Two Class definition. (*Id.*).

The Settlement Amount will be distributed through the Allocation Procedures. (Dkt. No. 4273-1 at 71); *see* Rule 23(e)(2)(C)(ii). The Allocation Procedures represent an "objective formula that [will] score a Qualifying Settlement Class Member's Impacted Water Source(s) using factors considered when calculating the real-world costs for the installation of PFAS treatment systems"—namely flow rate and the degree of PFAS concentration. (Dkt. No. 4273-1 at 23, 71); (Dkt. Nos. 3370-14 and -15) (describing the development of the Allocations Procedures with Drs. Michael

Trapp and Prithviraj Chavan of Atkins Global, an engineering firm specializing in water supply infrastructure). By way of example, Class Counsel notes that under the Settlement Agreement, the City of Stuart would be entitled to a substantial amount of the recovery it sought at trial:

> Plaintiff intended to proffer evidence that the compensatory damages associated with Stuart's Drinking Water claims totaled $76,750,290.00. Assuming Plaintiff was fully successful at trial, then as it pertains to Drinking Water claims only, Plaintiff could have expected $76,750,290.00 in compensatory damages. . . . [T]his represents the combined total of Plaintiff's compensatory damages across all of the named defendants . . . . Moreover, testimony at trial would have established that 3M's contribution in Stuart was at a minimum 89.4% [], which would have resulted in 3M being responsible for $68,614,759.26 in compensatory damages for Stuart's Drinking Water claims.
>
> Pursuant to the Allocation Procedures, with respect to the 3M Settlement, it is estimated that Stuart is entitled to $17,400,000.00. This alone represents a significant portion of the amount expected at trial . . . .

(Dkt. No. 4273-1 at 57) (footnotes omitted).

As to attorneys' fees, Class Counsel has moved, by separate motion, for 8% of the Settlement Amount in Class Counsel Fees. (Dkt. No. 4269). Though the Court will address an award of attorneys' fees later, it bears noting that no party objected to Class Counsel's request for attorneys' fees and that the Settlement Agreement itself does not provide a set amount or even a range of attorneys' fees, placing the matter entirely into the Court's hands for determination.

The Court finds that the Settlement Agreement is reasonable. *See* Rule 23(e)(2)(C)(i). As discussed at length above, success against 3M is not guaranteed and would only come, if ever, after years of protracted, expensive, complex litigation. The Settlement Agreement provides money not only to parties already affected by PFAS, but to those which may be so affected soon. The Settlement Agreement implements Allocation Procedures objectively derived from flow rates of Impacted Water Sources and PFAS concentrations which will be employed to allocate funds among Eligible Class Members under the guidance of the Court-Appointed Claims Administrator, himself under the oversite of the Court-appointed Special Master. The Settlement Agreement treats

class members equitably relative to each other based on objective criteria, *see* Rule 23(e)(2)(D), and the fact the parties did not set attorneys' fees or even a range of fees weighs in favor of finding the Settlement Agreement is reasonable. *See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D. La. 2007) (noting that "[b]ecause the parties have not agreed to an amount or even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for determination, there is no threat of the issue explicitly tainting the fairness of settlement bargaining").

### d.  Objections to the Settlement Agreement

The Court now addresses objections filed by Class Members regarding whether the Settlement Agreement satisfies Rule 23(e).  (Dkt. Nos. 3961, 3966, 3996, 3999, 4009, 4010, 4074); (Dkt. No. 4346). Objectors' arguments overlap substantially.

First, objectors contend that the Court must reject the Settlement Agreement because it does not compare the value of the settlement to the damages that could have been obtained at trial. *See* City of Vancouver Objections, (Dkt. No. 3961 at 27) ("The lack of a bellwether trial renders the 3M Agreement unfair and inadequate.").

The Court rejects this argument because Fourth Circuit case law does not require a trial on the merits as a prerequisite to settlement.  *See, e.g.*, *McAdams*, 26 F.4th at 160 (affirming approval of settlement and rejecting objector's contention that because a magistrate judge "failed to make a rough estimate of what class members would have received had they prevailed at trial" the settlement was not adequate and noting the court had "never required such an estimate" and was "not persuaded to impose this new requirement"); *Boger v. Citrix Sys., Inc.*, No. 19-CV-01234-LKG, 2023 WL 3763974, at *6 n.5 (D. Md. June 1, 2023) (noting the Fourth Circuit has never required an estimate of what class members would have received had they prevailed at trial); *In re Allura Fiber Cement Siding Litig.*, Civil Action No.: 2:19-mn-02886-DCN, 2021 U.S. Dist. LEXIS

96931, at *6 (D.S.C. May 21, 2021).

Second, objectors claim that the Settlement Amount is not adequate because "it pales in comparison to the PFAS-related damages that 3M has caused across the country while controlling over 70% of the historical PFAS market." (Dkt. No. 3961 at 25).

This argument is unconvincing. As noted above, the Settlement Agreement satisfies all *Jiffy Lube* factors related to adequacy and objectors present no convincing argument to the contrary. Further, as the Fourth Circuit has stated, the fact that a cash settlement "'may only amount to a fraction of the potential recovery' will not per se render the settlement inadequate or unfair." *Flinn*, 528, F.2d at 1173-74. Put bluntly, objectors argue—without evidentiary support—that 3M should have or could have "paid more." That argument, however, ignores the "insolvency risk" inherent here—a risk the Settlement Agreement considers directly. *See* (Dkt. No. 4319 at 20, 24-25) (noting 3M will fund the Settlement Agreement over 13 years, a schedule which allows "3M [to] pay more money over time, decreasing [its] bankruptcy risk" and "preserving funds for Phase Two Class Members"—class members which do not presently, but may one day, have a cognizable injury).

Third, objectors contend that the Settlement Amount is not properly allocated between Phase One and Phase Two Class members or between wholesalers[3] and retailers. *See, e.g.*, (Dkt. No. 3961 at 29). Specifically, objectors claim that: (1) when a retail water supplier obtains treated water from a wholesale supplier, it may not obtain funds, even if PFAS enters their system; (2) when a retailer treats the water they may receive the full potential allocation even though the wholesaler may face costs related to contamination; (3) the allocation between Phase One and Phase Two Claimants provide more funding for Phase One, even if Phase Two claimants discover

---

[3] Wholesalers define themselves as entities which "draw water from a source, treat water, and sell water to another entity" such as a retailer. (C.A. No. 2:23-cv-3147-RMG, Dkt. No. 73-1 at 3).

greater contamination; and (4) the methodologies used by Class Counsel may have vastly undercounted and therefore undercompensated Phase One. (Dkt. No. 4319 at 21).

As to the first two objections, the contentions ignore that the Allocation Procedures provide payment based on Impacted Water Sources. And as it concerns wholesalers and retailers, these critiques ignore that the Parties' Interrelated and Multiple PWS Guidance provide for recovery for Impacted Water Sources while preventing double recovery. *E.g.*, Interrelated Guidance, (Dkt. No. 3856-1 at 1-6) (noting that the Settlement Agreement provides for one payment for each respective water supply, "not a double recovery by both the wholesaler and the retail customer" and that the Claims Administrator, subject to the Special Master's oversight, will "allocate and distribute the Settlement Funds" equitably, taking into account whether the wholesaler and retailer have come to an agreement as to how to divide the Settlement Amount or the manner by which relative capital and O&M costs of PFAS are borne by the entities respectively); (*Id.* at 3) (noting that if the wholesaler opts out or is not in the settlement class but the retailer customer is, the retailer customer receives the recovery for the water if it is shown that it bears the PFAS treatment cost or vice-versa if the retail customer opts out or is not in the Settlement Class but the wholesaler is).

As to the third point, Plaintiffs correctly note that objectors provide no factual support for said argument and that the current 45% allocation to Phase Two Class Members is based on a conservative estimate regarding allocation by a "highly-esteemed expert in liability forecasting," thus refuting any basis for finding the Settlement Agreement unfair. Last, as to point (4), Plaintiffs note their expert considered the specific criticism lodged on this point and estimated a 39% detection rate for UCMR 5, even though the EPA has only released 7% of the total anticipated UCMR 5 which, to date, demonstrates only a 20% detection rate.

Fourth, objectors argue the Release is overbroad. (Dkt. No. 4319 at 25-37). Objectors contend the release is overbroad because it: (a) includes damage to real property, stormwater, or

wastewater caused by PFAS-contaminated Drinking Water; (b) includes parties that never assented to settle; (c) releases claims that do not share an "identical factual predicate"; (d) releases claims for unknown PFAS; and (e) releases personal injury claims. (Dkt. No. 4319 at 31).

As to point (a), the pertinent provisions read:

11.1.2.1 Paragraph 11.1.1(i)–(iii) does not apply to a Class Member's Claim related to the remediation, testing, monitoring, or treatment of real property to remove or remediate PFAS where (i) the Class Member owns or possesses real property and has legal responsibility to remove contamination from or remediate contamination of such real property; (ii) such real property is separate from and not related in any way to the Class Member's Public Water System (such as an airport or fire training facility); (iii) the Class Member seeks damages or other relief unrelated to Drinking Water or a Class Member's Public Water System or Water Sources; and (iv) if the Class Member seeks remediation, testing, monitoring, or treatment of groundwater under such real property, the Class Member either (a) identifies Non-Class Potable Water that may be adversely affected by the fate and transport of PFAS released into the groundwater under such real property or (b) is subject to a state or federal directive, order, or permit condition requiring groundwater remediation or treatment to the extent that the directive, order, or permit condition is not premised on a need to protect a Class Member's Public Water System or Water Sources. If a Class Member pursues such a Claim against any Released Party, the Class Member's Claim and damages shall be limited to the costs of remediating or removing PFAS from the property or groundwater under the property, in accordance with applicable or relevant state or federal regulatory cleanup standards and in a cost-effective manner.

11.1.2.2 Paragraph 11.1.1(i)–(iii) does not apply to a Class Member's Claim related to the discharge, remediation, testing, monitoring, treatment, or processing of stormwater or wastewater to remove or remediate PFAS at its permitted stormwater system or permitted wastewater facility where (i) the Class Member owns or operates a permitted stormwater system or permitted wastewater facility; (ii) such facility is separate from and not related in any way to the Class Member's Public Water System (such as a separate stormwater or wastewater system that is not related in any way to a Public Water System); (iii) the Class Member seeks damages or other relief unrelated to Drinking Water or a Class Member's Public Water System or Water Sources; and (iv) if the Class Member seeks remediation, testing, monitoring, or treatment of groundwater impacted by a permitted stormwater system or permitted wastewater facility, the Class Member either (a) identifies Non-Class Potable Water that may be adversely affected by the fate and transport of PFAS released into the groundwater from the separate stormwater system or wastewater facility, or (b) is subject to a state or federal directive, order, or permit condition requiring groundwater remediation or treatment to the extent that the directive, order, or permit condition is not premised on a need to protect a Class Member's Public Water System or Water Sources. If a Class Member pursues such a Claim against any Released Party related to stormwater or wastewater that will not be used for Drinking Water, the Class Member's Claim and damages shall be limited to the costs of remediating or removing

PFAS from the stormwater or wastewater in a cost-effective manner. If a Class Member pursues such a Claim against any Released Party related to groundwater that will not be used for Drinking Water and that has been impacted by stormwater or wastewater, the Class Member's Claim and damages related to groundwater shall be limited to the costs of remediating or removing PFAS from the groundwater, in accordance with any applicable state or federal regulatory groundwater cleanup standards in a cost-effective manner.

(Dkt. No. 3793-2 at 37-38).

The Settlement Agreement states it is intended to address "Public Water Systems' Claims regarding alleged PFAS-related harm to Drinking Water and associated financial burdens, including Public Water Systems' potential costs of monitoring, treating, or remediating PFAS in Drinking Water." (Dkt. No. 3793-2 at 1). While the Settlement Agreement releases claims arising from or related to "PFAS that has entered or may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System," Sections 11.1.2.1 and 11.1.2.2 exclude from Released Claims a PWS's Claims related to treatment of a Class Member's PFAS-contaminated real property, stormwater system, or wastewater system that is physically separate from the Class Member's PWS, does not arise from PFAS in PWS, and seeks relief unrelated to Drinking Water, its Public Water System, or its Water Sources.  The Parties have clarified that the phrase "separate real property or facility" means "*separate from and not physically related to.*" (Dkt. No. 4107-1 at 1-2) (emphasis added).  Given the types of claims the Settlement Agreement aims to resolve, the above definition of "separate real property or facility," and the accompanying guidance, the above language is not "overbroad" and promotes the Parties' intent of barring double recovery. Accordingly, the Court overrules objections as to point (a).

As to point (b), the pertinent language is Section 2.63 which defines "Releasing Parties" to include Class Members, their representatives, any Person acting on behalf of a Class Member, including in a representative or derivative capacity, and any Person that has authority to bring a claim on behalf of the Class Member. (Dkt. No. 3793-2 ¶ 2.63). "[C]lass action settlements have

in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (citing *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002)); *see In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d 139, 143, 160–65 (E.D.N.Y.2000) (approving class settlement with broad releases against non-parties, including insurance carriers, other banks, and Swiss governmental entities); 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 12:16, at 318 (4th ed. 2002) ("A settlement may . . . seek to discharge parties who have not been served with process and are therefore not before the court.").

In *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Prods. Liab. Litig.*, to prevent against double recovery, the definition of releasing parties included not only the settlement class member Volkswagen dealers, but "any other legal or natural persons who may claim by, through, or under them." MDL No. 2672 CRB (JSC), 2018 WL 1588012, at *8 (N.D. Cal., 2018). Such scope—maybe broader than the language here—was permissible on the logic that "[b]ecause the Intervenor Plaintiffs each assert claims 'by, through, or under [the class members],' they are Releasing Parties under the settlement agreement." *Id.* (internal citations omitted).

The Court overrules objections on this point. As the above cases demonstrate, the fact the Release releases claims against nonparties does not render the Settlement Agreement per se unreasonable. Objectors cite no case law to the contrary. At bottom, to avoid double recovery, the "Releasing Parties" must necessarily include those who may have a stake in recovery.

As to points (c) and (d), objectors state that because the Settlement Agreement releases claims for various types of PFAS, it is unreasonable. *See* (Dkt. No. 4319 at 32); (Dkt. No. 3793-2 ¶ 2.5) (defining "PFAS" to mean "any per- or poly-fluoroalkyl substances that contains at least

one fully fluorinated methyl or methylene carbon atom"). The Settlement Agreement also releases Claims that "may arise at any time in the future out of, relate[] to, or involve[] the development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application, or use of PFAS or any product (including AFFF) manufactured with or containing PFAS (to the extent such Claim relates to, arises out of, or involves PFAS)." (Dkt. No. 3793-2 at ¶ 11.1.1). Objectors argue that the Settlement Agreement cannot properly release claims related to all forms of PFAS because the released claims lack an identical factual predicate with this litigation.

A court can approve a release of claims that share an "identical factual predicate" with claims alleged in a case. *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015). Claims have an "identical factual predicate" when they "depend[ ] upon the very same set of facts." *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981)).

The Court finds that the release of claims for unknown PFAS shares an identical factual predicate with those for the release of PFOS and PFOA. The release of claims for all types of PFAS arises from allegations that 3M knew of the environmental and potential human health risks associated with exposure to PFAS, yet continued to develop, manufacture, distribute, and sell PFAS and products containing PFAS.  Additionally, as Class Counsel observes, the compensation provided by the Settlement Agreement is directly tied to the cost of treating such contamination and, regardless of the type of PFAS present in a Water Supply, "treatment [is] by the same method[]." (Dkt. No. 4319 at 32-33). The sole case objectors cite in support of their argument is distinguishable, as it found no identical factual predicate between released Telephone Consumer Protection Act Claims ("TCPA"), and Fair Debt Collection Practices Act and Florida Consumer Collection Practices Act claims. *Canter v. Midland Credit Mgmt., Inc.*, No. 314CV02939MMAMDD, 2017 WL 2817065, at *3 (S.D. Cal. June 28, 2017) (no identical factual

predicate because non-TCPA claims did not require use of "an ATDS, artificial or prerecorded voice, or any automated technology"). Here, there is no fundamental element lacking between releasing claims for PFOS and PFOA and all types of PFAS. The release sought by the Parties is commensurate with both the Settlement Amount, the Parties' desire to avoid double recovery, and the Parties' need for finality.

As to point (e), the Court rejects the contention that the Settlement Agreement improperly "releases" personal injury claims. PWS are not natural persons and cannot have personal injury claims of their own. *See* (Dkt. No. 4319 at 35). The Release provisions described above do not purport to release any individual's personal injury claims. Contentions to the contrary knowingly distort the text of the Settlement Agreement and objections on this basis are overruled.

The Settlement Agreement does, however, require Releasing Parties to release contribution and indemnity claims against 3M if the PWS is the subject of suits by injured individuals for personal injury claims. (*Id.* at 36). Such a release is common, however, in class action suits and objectors point to no case law holding that such a provision precludes a Court from finding a settlement is fair, adequate, or reasonable. *Caudle v. Sprint/United Management Company*, 2019 WL 2716291, at *4 (N.D. Cal., 2019) (approving release of indemnity claims arising from claims that are part of settlement); *Rieckborn v. Velti PLC*, 2015 WL 468329, at *10 (N.D. Cal., 2015) (same); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir.2001) ("It is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action."). To the extent a PWS believed the risk of suits such as those described above outweighed the utility of the Settlement Agreement, such PWS was free to opt-out. At bottom, this objection is less a challenge under Rule 23(e)(2) to the Settlement Agreement than a qualitative disagreement with the Settlement Agreement couched as a legal objection.

On a related point, the Court rejects the assertion that the Settlement Agreement "misallocates" liability. (Dkt. No. 3996 at 8). Section 11.4 reads: "Upon entry of the Final Judgment, each Releasing Party represents and warrants . . . future additions, modifications, or improvements to its Public Water System due to PFAS will be the sole responsibility of the Releasing Party and not the Released Parties." (Dkt. No. 3793-2 at 40). Broward County argues this language "limits" the liability of non-settling parties such that a Class Member could not sue non-settling Defendants for the Released Claims. That contention, however, finds no support in the plain language of the Settlement Agreement and the Court rejects it as groundless. *See* (Dkt. No. 3793-2 at 41-42) ("*Nothing herein prevents a Releasing Party from pursuing litigation against a non-Released Party and collecting the full amount of any judgment*, except to the extent it is necessary to protect the Released Party to fully extinguish a Claim-Over under applicable law.") (emphasis added).

Fifth, objectors contend that because the Settlement Agreement does not "specify a set-off" method, it is per se invalid. *See, e.g.*, (Dkt. No. 4319 at 48) (citing *Jiffy Lube,* 927 F.2d at 160).

The Court rejects objections on this point. The Settlement Agreement provides at paragraph 11.6 for a set off and judgment reductions in subsequent actions against non-settling defendants which would operate "under applicable law." (Dkt. No. 3793-2 ¶ 11.6.2). In *Jiffy Lube*, the Fourth Circuit approved of similar language as it applied to state-law claims. 927 F.2d at 160; *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. 158, 182 (E.D. Pa. 1997) ("State statutes and court decisions differ as to what form the judgment credits should take. Certain states require a proportionate share reduction, others apply a *pro tanto* judgment credit and some states give a *pro rata* credit. Regardless of the applicable jurisdiction, under this agreement, non-settling defendants will receive, at a minimum, a set-off or judgment reduction consistent with state law. Allowing non-settling defendants the benefit of whatever judgment reduction that is required under

state law is fair and reasonable.").

Objectors also take issue with the Claim-Over provision and argue it functions as an unlimited indemnity for 3M which would violate state constitutions and statutes "that regulate the circumstances and procedures under which municipalities and other political subdivision [] assume debt." *See, e.g.*, (Dkt. No. 4319 at 50).

Sections 11.6.2. and 11.6.4 read:

11.6.2. The Order Granting Final Approval will specify that the Settlement is a good-faith settlement that bars any Claim by any non-Released Party against any Released Party for contribution, for indemnification, or otherwise seeking to recover any amounts paid by or awarded against that non-Released Party and paid or awarded to any Releasing Party by way of settlement, judgment, or otherwise on any Claim that would be a Released Claim were such non-Released Party a Released Party (a "Claim-Over"), to the extent that a good-faith settlement (or release thereunder) has such an effect under applicable law.

. . .

11.6.4. If a Released Claim asserted by a Releasing Party gives rise to a Claim-Over against a Released Party and a court determines that the Claim-Over can be maintained notwithstanding the order referenced in Paragraph 11.6.2, the Releasing Party shall reduce the amount of any judgment it obtains against the non-Released Party who is asserting the Claim-Over by whatever amount is necessary, or take other action as is sufficient, to fully extinguish the Claim-Over under applicable law. Nothing herein prevents a Releasing Party from pursuing litigation against a non-Released Party and collecting the full amount of any judgment, except to the extent it is necessary to protect the Released Party to fully extinguish a Claim-Over under applicable law.

(Dkt. No. 3793-2 at 41-42).

The Court overrules objections to the Claim-Over provision. Section 11.6.2 precludes a non-settling defendant who is ordered to pay a Settlement Class member from recovering that amount from 3M—which has already paid the Settlement Amount. And 11.6.4 permits a Settlement Class member to sue a non-settling defendant, though recovery is reduced against said defendant by the amount the Releasing Party has *already* received from 3M. Such provisions are necessary to encourage settlement of complex litigation which would otherwise linger for years.

Further, as even objectors admit, said provisions are common and "widely used" in multi-party litigation. *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. at 182. At bottom, to present this straw man argument, objectors intentionally distort the plain language of the Settlement Agreement. Accordingly, the Court rejects the contention that the Claim-Over is a "secret" or "functional" indemnity.

Sixth, objectors argue that the Notice provided to putative Class Members was insufficient and that they lacked adequate time to consider the terms of the Settlement Agreement. Objectors argue that the Parties' Interrelated Guidance constituted an improper late amendment, which required additional notice and an unquantified amount of additional time for putative Settlement Class members to consider. *See* Interrelated Guidance, (Dkt. No. 3856-1) (filed on October 25, 2023 and accepted by the Court on October 26, 2023).

Material alterations to a class settlement generally require a new round of notice to the class and a new Rule 23(e) hearing. *Pearson v. Target Corp.*, 893 F.3d 980, 986 (7th Cir. 2018) (citing *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 & n.10 (3d Cir. 2013)). This requirement "may be implicated when class counsel seeks to bargain away the right to enforce portions of a previously entered settlement." *Keepseagle v. Vilsack*, 102 F.Supp.3d 306, 313–14 (D.D.C. 2015).

As a preliminary matter, the Court finds that the Interrelated Guidance is not "substantive" in nature such that accepting said guidance "contradict[s]" the Court's preliminarily approval findings. The Interrelated Guidance instead confirmed what wholesalers and retailers already understood to be true—that the Settlement Agreement applied to them. (2:23-cv-3147-RMG, Dkt. No. 73-2 at 4) (October 9, 2023 letter to Class Counsel stating that "[t]he text of the Proposed Settlement[] appears to weigh in favor of binding qualifying wholesalers as settlement class members"). The Interrelated Guidance further confirmed that the Claims Administrator, already vested with discretionary authority under the Settlement Agreement, would allocate and distribute

Settlement Funds amongst wholesalers and retailers in a manner consistent with the Allocation Procedures. Objectors provide no concrete argument as to how this guidance "materially" altered the Court's preliminary approval analysis or "bargained away" their right to enforce any part of the preliminarily approved Settlement Agreement.

Relatedly, the Court rejects objectors' conclusory assertion that eligible class participants have not received "adequate notice of" the Interrelated Guidance. The assertion is belied by the fact the Interrelated Guidance was drafted in direct response to the Metropolitan Water District of Southern California and the North Texas Municipal Water District's (collectively "Wholesalers") October 20, 2023 motion to intervene for limited purpose. (Dkt. No. 2:23-cv-3147-RMG, Dkt. No. 73).

In sum, the Court finds that objectors had adequate time to consider the Settlement Agreement, including the Interrelated Guidance. The Settlement Agreement was filed on the docket on July 3, 2023, the PAO was issued on August 29, 2023, and the Notice Plan began on September 12, 2023.  The opt-out deadline was December 11, 2023, giving parties 90 days to decide whether to accept the Settlement Agreement.  Wholesalers were aware of the Settlement Agreement as they directly contacted Class Counsel in early October regarding the same. (C.A. No. 2:23-cv-03147-RMG, Dkt. No. 73-2 at 4). Thus, the Court rejects the argument that Wholesalers did not have enough time to evaluate the Settlement Agreement. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 240-41 (D.N.J. 1997) (rejecting argument that the opt out period of 46 days was too short, precluding class members of meaningful review of the Proposed Settlement and collecting cases holding that an opt-out period of thirty to sixty days is appropriate); *Ashley v. GAF Materials Corp. (In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.)*, No. 8:11-mn-02000, 2014 U.S. Dist. LEXIS 183679, at *34-35 (D.S.C. Oct. 15, 2014) (stating that "[p]eriods of approximately two (2) months for opting out have

been approved in other cases.").

As it concerns Little Hocking Water Association, Inc. ("Little Hocking")'s objection that it was not provided sufficient time to analyze the "tax consequences" of accepting the Settlement Agreement on its tax-exempt status, (Dkt. No. 4009), the Court rejects the argument for many of the same reasons stated above—namely that Little Hocking has had at least 90 days to explore these questions with its attorneys.  As Class Counsel further notes, "[n]one of the other [12,000] class members have raised such a concern" and "Little Hocking cites no case law supporting the proposition that the need to assess tax consequences of a settlement should trigger a longer than normal period to consider whether to opt out." (Dkt. No. 4319 at 47) (observing "[a]ll Class Members had from August 29, 2023 until the opt-out deadline of December 11, 2023, to consider whether to exclude themselves from the Settlement, which is a total of 105 days"); (*Id.* at 47-48) (noting Little Hocking was a party to previous settlements regarding PFOA contamination and has "had a GAC treatment in place paid for by DuPont" for over 15 years, undermining the claim the tax issues presented by the instant Settlement Agreement are novel).

### Conclusion

For the reasons stated above, the Court **GRANTS** Class Counsel's motion for final approval of class settlement and final certification of the settlement class (Dkt. No. 4273; C.A. No. 2:23-cv-3147-RMG, Dkt. No. 177) and **GRANTS** the Parties' joint motion for entry of final order and judgment (Dkt. No. 4605; C.A. No. 2:23-cv-3147-RMG, Dkt. No. 222). A copy of the Final Order and Judgment is attached as Exhibit A.

**AND IT IS SO ORDERED**

March 29, 2024
Charleston, South Carolina

s/Richard Mark Gergel
Richard M. Gergel
United States District Judge
